**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INVIDI TECHNOLOGIES CORPORATION, | |
| Plaintiff, | C.A. No. 11-397 (RGA-CJB) |
| v. | |
| VISIBLE WORLD, INC. and CSC HOLDINGS, LLC |  |
| Defendants. | REDACTED |

**JOINT CLAIM CONSTRUCTION BRIEF**
**OF PLAINTIFF INVIDI TECHNOLOGIES AND**
**DEFENDANTS VISIBLE WORLD, INC.**
**AND CSC HOLDINGS, LLC**

Morris, Nichols, Arsht & Tunnell LLP
Jack B. Blumenfeld (#1014)
Regina S.E. Murphy (#5648)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rmurphy@mnat.com

Of Counsel:

John E. Nathan
Catherine Nyarady
Andrew S. Brown
Paul, Weiss, Rifkind, Wharton
 & Garrison LLP
1285 Avenue Of The Americas
New York, NY 10019

*Attorneys For Defendants Visible World, Inc.*
*and CSC Holdings, LLC*

Fish & Richardson P.C.
Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
halkowski@fr.com

Of Counsel:

Frank E. Scherkenbach
Steven R. Katz
Fish & Richardson P.C.
One Marina Park Drive
Boston, Ma 02210

*Attorneys For Plaintiff*
*Invidi Technologies Corporation*

Benjamin Hershkowitz
R. Scott Roe
Justin Solomon Nematzadeh
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

*Attorneys For Defendant CSC Holdings, LLC*

Dated:  January 11, 2013

## TABLE OF CONTENTS

I.  AGREED-UPON CONSTRUCTION ................................................................................. 1

II. DISPUTED CONSTRUCTION ..................................................................................... 1

  A.  "Selectively distributing messages over a communications network" ................... 1
    1.  Plaintiff's Opening Position........................................................................ 1
    2.  Defendants' Answering Position ................................................................ 9
    3.  Plaintiff's Reply Position ......................................................................... 21
    4.  Defendants' Sur-Reply Position .............................................................. 30
  B.  "Commercial messages" ........................................................................................ 35
    1.  Plaintiff's Opening Position...................................................................... 35
    2.  Defendants' Answering Position .............................................................. 36
    3.  Plaintiff's Reply Position ......................................................................... 39
    4.  Defendants' Sur-Reply Position .............................................................. 40
  C.  "Network Address" ................................................................................................ 41
    1.  Plaintiff's Opening Position...................................................................... 42
    2.  Defendants' Answering Position .............................................................. 44
    3.  Plaintiff's Reply Position ......................................................................... 46
    4.  Defendants' Sur-Reply Position .............................................................. 48
  D.  "A reservoir of data" ............................................................................................. 49
    1.  Plaintiff's Opening Position...................................................................... 49
    2.  Defendant's Answering Position .............................................................. 50
    3.  Plaintiff's Reply Position ......................................................................... 51
    4.  Defendants' Sur-Reply Position .............................................................. 52
  E.  "Subscriber profile data"....................................................................................... 53
    1.  Plaintiff's Opening Position...................................................................... 53
    2.  Defendants' Answering Position .............................................................. 54
    3.  Plaintiff's Reply Position ......................................................................... 56
    4.  Defendants' Sur-Reply Position .............................................................. 57
  F.  "Demographic data"............................................................................................... 58
    1.  Plaintiff's Opening Position...................................................................... 58
    2.  Defendants' Answering Position .............................................................. 59
    3.  Plaintiff's Reply Position ......................................................................... 60

i

      4.     Defendants' Sur-Reply Position ............................................................ 61

G.    "Operatively associated with".................................................................. 62

      1.     Plaintiff's Opening Position.................................................................. 62

      2.     Defendants' Answering Position ........................................................... 62

      3.     Plaintiff's Reply Position ..................................................................... 63

      4.     Defendants' Sur-Reply Position ............................................................ 64

H.    "Identifying . . .terminal".......................................................................... 64

      1.     Plaintiff's Opening Position.................................................................. 64

      2.     Defendants' Answering Position ........................................................... 66

      3.     Plaintiff's Reply Position ..................................................................... 69

      4.     Defendants' Sur-Reply Position ............................................................ 70

I.     "Selection means"..................................................................................... 70

      1.     Plaintiff's Opening Position.................................................................. 70

      2.     Defendants' Answering Position ........................................................... 71

      3.     Plaintiff's Reply Position ..................................................................... 72

      4.     Defendants' Sur-Reply Position ............................................................ 74

J.     "Identifying means" .................................................................................. 75

      1.     Plaintiff's Opening Position.................................................................. 75

      2.     Defendants' Answering Position ........................................................... 75

      3.     Plaintiff's Reply Position ..................................................................... 77

      4.     Defendants' Sur-Reply Position ............................................................ 78

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**CASES**

*Alloc, Inc. v. Pergo, Inc.*,
    Nos. 2009-1107, 2009-1122, 2010 WL 661253 (Fed. Cir. Feb. 25, 2010) .............................36

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003).....................................................................................3, 15, 28

*American Medical Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2010)...................................................................................................30

*Apple Inc. and NeXT Software Inc. v. Motorola, Inc.*,
    Civ. A. No. 1:11-cv-08540 (N.D. Ill. March 10, 2012) (Posner, J.).......................................50

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006)...................................................................................................59

*Aristocrat Techs. Austl. Pty Ltd. V. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)...................................................................................................71

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
    216 F.3d 1042 (Fed. Cir. 2000)...................................................................................................19

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012)...................................................................................................35

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006).....................................................................................................60

*Black Diamond CCT Holdings, LLC v. Coupons, Inc.*,
    2003 WL 25783115 (D. Md., December 17, 2003)..............................................................62, 63

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)............................................................................................72, 74

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    338 F.3d 858 (Fed. Cir. 2004).....................................................................................................46

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004).......................................................................................................6

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*,
    224 F.3d 1308 (Fed. Cir. 2000)...................................................................................................60

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
  289 F.3d (Fed. Cir. 2002)........................................................................15, 21, 28

*Comaper Corp. v. Antec, Inc.*,
  596 F.3d 1343 (Fed. Cir. 2010)................................................................................59

*Computer Docking Station Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008)................................................................................13

*Cytologix Corp. v. Ventana Med. Sys., Inc.*,
  424 F.3d 1168 (Fed. Cir. 2005)................................................................................37

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
  279 F.3d 1022 (Fed. Cir. 2002)................................................................................14

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009)................................................................................37

*Finisar Corp. v. DirecTV Group, Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008)........................................................................15, 74

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
  616 F.3d 1357 (Fed. Cir. 2010)..................................................................................8

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998)................................................................................68

*Harari v. Holmer*,
  602 F.3d 1348 (Fed. Cir. 2010)................................................................................19

*Harris Corp. v. IXYS Corp.*,
  114 F.3d 1145 (Fed. Cir. 1997)..................................................................................8

*Helmsderfer v. Bobrick Washroom Equip.*,
  527 F.3d 1379 (Fed. Cir. 2008)................................................................................30

*Hitachi Cons. Elecs. Co. v. Top Victory Elecs. Co.*,
  No. 2:10-cv-260, 2012 WL 5494087 (E.D. Tex. Nov. 13, 2012)............................48

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)..................................................................................49

*iLOR, LLC v. Google, Inc.*,
  631 F.3d 1372 (Fed. Cir. 2011)................................................................................27

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)....................................................................16, 60, 63, 64

*K-2 Corp. v. Salomon S.A.,*
   191 F.3d 1356 (Fed. Cir. 1999)..................................................................................64

*Kahn v. General Motors Corp.,*
   135 F.3d 1472 (Fed. Cir. 1998)..................................................................................76

*Katz Interactive Call Processing Litig. V. Am. Airlines, Inc.,*
   639 F.3d 1303 (Fed. Cir. 2011)..............................................................................5, 46

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004)....................................................................................57

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995)......................................................................................36

*Marrin v. Griffin,*
   599 F.3d 1290 (Fed. Cir. 2010)..............................................................................21, 34

*MBO Labs., Inc. v. Beckton, Dickinson & Co.,*
   474 F.3d 1323 (Fed. Cir. 2007)..................................................................................13

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB,*
   344 F.3d 1205 (Fed. Cir. 2003)........................................................................70, 76, 77

*Medicis Pharm. Corp. v. Actavis Mid Atlantic LLC,*
   Civ. A. No. 11-409-LPS-CJB, 2012 WL 2126873 (D. Del. June 12, 2012) ..............37, 50, 59

*Medrad, Inc. v. MRI Devices Corp.,*
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................38

*Medtronic Inc. v. Advanced Card. Sys. Inc.,*
   248 F.3d 1303 (Fed. Cir. 2001)..................................................................................77

*Merck & Co. v. Teva Pharms. USA, Inc.,*
   395 F.3d 1364 (Fed. Cir. 2005)..................................................................................76

*Micron Tech., Inc. v. Tessera, Inc.,*
   440 F. Supp. 2d 591 (E.D. Tex. 2006)........................................................................30

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.,*
   520 F.3d 1367 (Fed. Cir. 2008)..................................................................................34

*Middleton, Inc. v. Minnesota Mining and Manufacturing Co.,*
   311 F.3d 1384 (Fed. Cir. 2002)..................................................................................15

*Net MoneyIN, Inc. v. Verisign, Inc.,*
   545 F.3d 1359 (Fed. Cir. 2008)........................................................................71, 74, 75

*Noah Systems, Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012)..............................................................................71, 76

*NTP, Inc. v. Research In Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)...................................................................................6

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)....................................................................37, 50, 59

*On Demand Mach. Corp. v. Ingram Indus.*,
   442 F.3d 1331 (Fed. Cir. 2006)....................................................................12, 15, 28

*Outside Box Innovations, LLC* v. *Travel Caddy, Inc.*,
   2008 WL 145247 (Fed. Cir. Jan. 15, 2008) .............................................................38

*Pause Tech., LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005)........................................................................ passim

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)........................................................6, 35, 38, 40

*Poly-America L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004)...........................................................................12, 28

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010).............................................................43, 45, 47, 48

*Rowe v. Dror*,
   112 F.3d 473 (Fed. Cir. 1997)..............................................................................14, 34

*SanDisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005)..................................................................................74

*Schumer v. Lab. Computer Sys., Inc.*,
   308 F.3d 1304 (Fed. Cir. 2002)...............................................................................3, 15

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
   550 F.3d 1356 (Fed. Cir. 2008)..................................................................................37

*Symantec Corp. v. Computer Assocs. Int'l*,
   522 F.3d 1279 (Fed. Cir. 2008)..................................................................................32

*United States Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)..............................................................................7, 64

*Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*,
   375 F.3d 1341 (Fed. Cir. 2004)..................................................................................39

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)......................................................................24

*Vizio, Inc. v. TVP Tech., Ltd.*,
    605 F.3d 1330 (Fed. Cir. 2010)......................................................................13

*V–Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)......................................................................39

*Wang Laboratories, Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)................................................................47, 49

**STATUTES**

35 U.S.C. § 112..........................................................................................................71

35 U.S.C. § 112 ¶ 6.....................................................................................................74

**OTHER AUTHORITIES**

37 C.F.R. § 1.75.........................................................................................................30

Civ. R. Fed. P. § 1.75(e)(2)......................................................................................30

## I.     AGREED-UPON CONSTRUCTIONS

There are no agreed-upon constructions.

## II.     DISPUTED CONSTRUCTIONS

### A.     "Selectively distributing messages over a communications network"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "selectively distributing messages over a communications network" | No construction necessary/ alternatively, delivering messages such that they are received and displayed by selected subscriber terminals | Sending each specific message only to the one or more network addresses selected to receive that message over a communications network |

### 1.     Plaintiff's Opening Position

In traditional cable television advertising, everyone sees the same advertisement.  In targeted advertising, different households see different advertisements.  One form of targeted advertising is "household addressable" advertising.  In a cable network delivering household addressable advertisements, multiple advertisements are broadcast down one or more special advertising channels.  Some set top boxes are instructed to tune to one advertisement while others are instructed to tune to a different advertisement.

For example, a dog food commercial might be targeted to dog owners at the same time a cat food commercial is targeted to cat owners.  Through household addressable advertising, relevant commercial messages are delivered to the right consumers.

Invidi's patent, U.S. Patent No. 5,661,516[1], describes a particular system and method for providing targeted advertising, and more particularly, household addressable advertising.  As the title of the patent states, it is a "System and Method For Selectively Distributing Commercial Messages Over A Communications Network."  In other words, targeted advertising.

---

[1] *See* JA-1 to JA-11.

Figure 5 of the patent illustrates some of the components of a traditional cable system, which is one of the communication networks disclosed in the patent:



The local distribution centers (also called hubs) would each have cables leading to the set top boxes in consumers' homes:



The '516 patent provides a novel system and method for targeted advertising on cable (and other) networks.  In the illustration above, all four households are viewing the same channel, but two households are viewing a car advertisement at the same time two other households are viewing an XBox advertisement.

The system of claim 1 of the '516 patent accomplishes this goal with three elements:

(1) a reservoir of data,

(2) a "selection means," and

(3) an "identifying means."

Each of these elements will be discussed in depth later in this brief, but the specifics are not relevant to the construction of the term "selectively distributing."

Rather, the term "selectively distributing" is found in the preamble of the claim, and states the purpose of the invention—it is a system and method "for selectively distributing messages over a communications network." The '516 patent, toward this purpose, claims a method and system for targeted advertising.

Like the preamble to the Constitution, a claim preamble often sets the stage for the enumerated elements to come. In the Constitution, the three branches of the federal government are established. The purpose, as stated in the preamble, is "to form a more perfect union." A preamble in a patent claim can serve the same function. It often describes the context or purpose of an invention that will be described later in the claim.

When a preamble sets the context for an invention, such as the purpose for the invention (as is the case with the disputed language here), the language describing an invention's purpose is not itself an element of the invention. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003) (distinguishing preamble language that merely states purpose of invention and does not limit the scope of the invention); *see also Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002) (preamble language not limiting where "language of the body of the claim 'sets out the complete invention' in that it provides in detail the functional attributes of the device that performs the methods"). In other words, when comparing the claim to an

3

accused device, the jury ignores any statements of purpose.  Rather, the jury compares the

structural limitations of the claim to the structure of the accused product—without regard to

purpose.  Accordingly, there is little point in construing statements of purpose because they do

not affect the infringement analysis.

The phrase "for selectively distributing" is not a structural element of the invention.  It

merely describes the purpose of the invention:  "**In a system for** selectively distributing

messages over a communications network . . . ."[2]   How the invention accomplishes this purpose

(and what distinguishes the invention from the prior art) is described in the text that follows[3].

For example, claim 1 recites:

> 1. **In a system for selectively distributing messages over a communications network,** said system including a source of commercial messages, and a controller communicating over the network with a plurality of subscriber terminals in a plurality of subscriber households served by the communications network and controlling the transmission of the commercial messages from the source to the subscribers households over the network, each of the subscriber terminals having a network address, **the combination of**:
>
> **[1] a reservoir of data** containing network addresses of the subscriber terminals and subscriber profile data associated with each of the subscriber households and including demographic data;
>
> **[2] selection means** operatively associated with said reservoir for selecting at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least one subscriber terminal; and
>
> **[3] identifying means** operatively associated with said reservoir for identifying the selected at least one commercial message with the network address of said at least one subscriber terminal.

The jury will be instructed to compare the structures of claim 1 (the reservoir, the selection

means, and the identifying means) with the structures of the accused product.  The purpose stated

at the front of the claim is not part of the comparison.  In fact, providing a construction would

---

[2] Emphasis added throughout the brief unless otherwise stated.
[3] To the extent that structures are referenced in the preamble, such portion of the preamble may be limiting.  However, the phrase in question here is not a structure and is not limiting.

only confuse the jury as to what is part of the invention should be considered and what is merely a stated purpose.  Accordingly, no construction is necessary.

Should the Court choose to construe this phrase, then Invidi submits that the proper construction is "delivering messages such that they are received and displayed by selected subscriber terminals."  This construction focuses on the broad purpose of the invention—to display different advertisements to different households.  For example, the Abstract of the patent states that a server "transmits the messages on the network to be **received and displayed by the addressed converters**."

"Selective distribution" is a broad concept.  For example, one of the "objects of the invention" is to "provide a method and system for dynamically distributing commercial programming to **selected target households**."  (1:57).  The distribution is "selective" because different households are "selected" to receive different advertisements.  The patent gives an example of a luxury car advertisement that is targeted to households identified as in the top 30th percentile of those likely to purchase a luxury car.  (9:29-34).  Households meeting the selected criteria see the luxury car advertisement.  Other households do not.

The term "selectively distributing" is straight-forward.  So, what is the dispute?  As Invidi understands their position, the Defendants seek a construction that would exclude traditional cable systems from the scope of the patent.  Even though their proposed construction does not get them there, that appears to be their intent.

The Defendants seek to exclude traditional cable systems even though Figure 3 illustrates a preferred embodiment that is capable of "provid[ing] analog or digital, real time programs 35, such as broadcast programs and **cable programs**."  (3:3-5).  There is a "strong presumption against a claim construction that excludes a disclosed embodiment." *Katz Interactive Call*

5

*Processing Litig. V. Am. Airlines, Inc.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011).  Such a construction "'is rarely, if ever, correct.'"  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  The patent describes "selective distribution" of programming on a traditional cable television system and cites to prior art describing "selective distribution" on traditional cable television systems.[4]  The intrinsic record is thus clear that a traditional cable system can "selectively distribute" media by broadcasting media and instructing selected terminals to display the media.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("The prosecution history, which we have designated as part of the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.").

Besides attempting to construe this term to read out a preferred embodiment, the Defendants' construction would also confuse the jury by swapping three simple words ("selectively distributing messages") with seventeen ("sending each specific message only to the one or more network addresses selected to receive that message").  This construction seeks to limit the phrase in four ways—each of which appears to be an improper attempt to read the cable network embodiment out of the claims:

(1) The Defendants first try to shoehorn in the concept of a "network addresses."  It is true that the set top boxes in the patent have network addresses.  Nonetheless, the concept of "selectively distributing messages" does not require a "network address."  *See, e.g., NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1300 (Fed. Cir. 2005) (declining to construe the term

---

[4] The Kauffman reference cited in the Background of the patent (1:41-55), describes a cable system that selectively distributes messages by broadcasting messages on a cable network after pre-assigning set top boxes to different groups. (JA-12 to JA-21)

"originating processor" as requiring the separately claimed "gateway switch" or "interface switch" and explaining that "these limitations are used as three separate, independent limitations to describe the various constituent components in an electronic mail system").   Forcing this additional "network address" limitation into "selectively distributing messages" defies the claim language and the specification, and is therefore improper.

(2) The Defendants would also rewrite "selectively distributing" to selectively distributing "**to a network address**."   However, the phrase "selectively distributing" does not identify the destination of the distribution—and none should be "read in" to that broad phrase. That destination is certainly not limited to a "network address."   Moreover, the claims say something fundamentally different—that commercial messages are sent "to **the subscribers households**."   Accordingly, the Defendants' construction also conflicts with other portions of the claim.   In addition, one may distribute messages to households (e.g., via broadcasting) without distributing each message to "a network address."   There is no basis to rewrite "selectively distributing" to "selectively distributing to a network address," because the claim only requires that the messages be distributed to the households, not to "network addresses."

(3) The Defendants refer to "each specific message" whereas the term being construed uses the more generic reference to "messages"—which can be more than one.   Again, the Defendants simply add words (*e.g.* "each specific") not found in the claim.   Plus, this construction is ambiguous.   Does the Defendants' construction rule out this possibility of multiple messages at once?   If so, then it cannot be correct. If not, then what does "each specific message" mean and why do Defendants want this construction?   Regardless, the Defendants' construction not only unnecessarily adds limitations to the claims, it is also vague and ambiguous and will not aid the jury in understanding what "selectively distributing" means. *See United*

7

*States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim

construction is a matter of resolution of disputed meanings and technical scope, to clarify and

when necessary to explain what the patentee covered by the claims, for use in the determination

of infringement."); *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir.

2010) ("The criterion is whether the explanation aids the jury in understanding the term as it is

used in the claimed invention").

      (4) Finally, selectively distributing media on a cable system is accomplished by

broadcasting a message and telling certain selected set top boxes to receive the message.  Other

set top boxes ignore the message.[5]  For example, HBO is selectively distributed to those

households who subscribe to that premium movie channel.  Every set top box "sees" the HBO

channel (it is physically broadcast on the cable), but only the selected households **receive and**

**display** the HBO programming.

      Nonetheless, the Defendants seek a construction requiring "sending . . . only to" selected

destinations.  Do the Defendants intend for their construction of "selectively distributing" to

exclude the "selectively distributing" of HBO programming?  If so, their construction is contrary

to the ordinary meaning of that term.  Because the Defendants' construction is ambiguous and

vague, and creates more questions than it answers, the Defendants' construction should be

rejected.  *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1145, 1152 (Fed. Cir. 1997) (rejecting

construction that would "contribute nothing but meaningless verbiage to the definition of the

claimed invention."); *see also Funai*, 616 F.3d at 1366.

      The Defendants seek to limit the term in ways that go far beyond what the simple words

"selectively distributing" can support.  Accordingly, if the Court finds that a construction is

---

[5] *See* Kauffman reference at 5:38-39 ("If a message is not directed to the particular converter, it
is ignored.")

needed, and Invidi believes it is not, Invidi submits that the jury would be best aided by the construction: "delivering messages such that they are received and displayed by selected subscriber terminals."

### 2.      Defendants' Answering Position

The term "selectively distributing messages over a communications network" is properly construed to mean "sending each specific message only to the one or more network addresses selected to receive that message over a communications network."   As explained below, Defendants' construction is driven by the specification and the plain language of the claims themselves.  Invidi, in contrast, ignores the clear intrinsic evidence in favor of a cherry-picked portion of a sentence from the patent's Abstract, and descriptions of technology that have no basis in the patent, but are intended to cover the accused systems.

The specification of U.S. Patent No. 5,661,516 ("the '516 patent") clearly describes a method (and a system for implementing that method) that is used in conjunction with prior art addressable messaging systems that allow messages to be sent to particular households by addressing the messages to the households' set top boxes.  *See, e.g.*, '516 patent at 4:36-40.  The method consists of accessing a database that contains network addresses associated with a variety of subscriber data including demographic data (*see, e.g.*, *id.* at 3:41-45), selecting commercial messages to send to particular households based on an analysis of the subscriber data including demographic data (*see, e.g.*, *id.* at 4:66-6:2), and then addressing the selected commercial messages to allow them to be sent to the particular households (*see, e.g.*, *id.* at 9:17-21).   Defendants' construction accurately reflects the teaching of the specification and the purpose of the claims.

Invidi's construction is an improper attempt to broaden the claims to systems that do not address commercial messages to set top boxes, including the accused systems.   The accused

9

systems do not have a "reservoir of data" as required by the patent, do not "select" commercial messages for transmission to subscribers as required by the patent, and do not "identify" commercial messages with network addresses of subscribers as required by the patent.  For example, for the third party advertising campaigns Invidi alleges are acts of infringement, a trusted third party data services provider, not either Defendant, segments the households.  The accused systems also do not selectively distribute commercial messages.  Information is sent to each set top box representing which segment that set top box is in.  All of the variant advertisements that comprise the advertising campaign are broadcast to every set top box.  The set top boxes tune to the appropriate advertisement based on the information each received. Invidi's discussion of how addressable advertising works, and how the claim terms should be construed, is based on an attempt to capture the operation of the accused systems, not on the teachings of the '516 patent.

Invidi's explanation of the difference between traditional advertising, where "everyone sees the same advertisement," and targeted advertising, where "different households see different advertisements" is overly generalized.  *Supra* p 1.  While it is certainly true that targeted advertising involves "different households see[ing] different advertisements," the asserted patent does not purport to have invented that concept, and it certainly does not claim every way of doing so.  Thus, the fact that Defendants provide "targeted advertising" to their customers is of no help to Invidi, because they do not provide "targeted advertising" in the manner claimed by the asserted patent.

The patent-in-suit suggests a very specific way of accomplishing this goal: by "selectively distributing" messages; that is, sending a specific message only to those selected to receive it.  In the example provided by Invidi (*Supra* p. 2), that would mean that the car

10

advertisement would have only been distributed to households 1 and 3, and ***not*** to households 2 and 4.  Similarly, the Xbox advertisement would only have been distributed to households 2 and 4, and ***not*** to households 1 and 3.  This could be done in a number of ways, including for example, distributing the media files to the set top boxes prior to the time the advertisement is to be viewed.



There are other ways of accomplishing the goal of "different households see[ing] different advertisements."  As just one example, both the car advertisement and the Xbox advertisement could have been distributed to households 1 through 4, and at the appropriate time, each set-top box could be told which advertisement to display.  In such instance, while there might have been "selective display" of commercial messages, there certainly would not have been any "selective distribution" of them.



It is this distinction—between the action of "distribution" and the separate (and unclaimed) action of "displaying"—that Invidi's construction obscures and that is at the heart of the dispute between the parties' claim constructions.  Invidi ***knows*** that Defendants do not

"selectively distribute" commercial messages to their customers.  Indivi **knows** that Defendants distribute **all** advertisements to **all** customers.  Thus, it **knows** that there can be no infringement unless it improperly expands the asserted claims such that the concept of "selective distribution" also includes the concept of "selective display" of commercial messages.

Regardless of any arguments about Defendants' proposed construction, Invidi's construction, which attempts to include the notion of "displayed" in the construction of "distribution," improperly seeks to expand the bounds of what was allegedly invented and actually claimed in order to ensnare activity which is entirely non-infringing.  There is nothing about "selectively distributing"—nothing in the claim, nothing in the specification, nothing in the file history—that supports the construction of "delivering messages such that they are received and **displayed** by selected subscriber terminals."

Although the specification describes the selective distribution of messages as a necessary aspect of the claimed invention, Invidi argues that no construction is necessary because "selectively distributing messages over a communications network" appears in the preamble of the claim, is a mere "statement of purpose," and is not a claim requirement.  *Supra* pp. 3-4. Invidi's argument should be rejected.  Where a term in the preamble of a claim states "a necessary and defining aspect of the invention"—here selectively distributing messages over a communications network, *i.e.*, "sending each specific message only to the one or more network addresses selected to receive that message over a communications network"—it is a substantive limitation of the claim.  *See On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006); *see also Poly-America L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004) (internal quotation marks and citation omitted) (when the preamble "recit[es] additional structure or steps underscored as important by the specification, the preamble may

12

operate as a claim limitation."); *Vizio, Inc. v. TVP Tech., Ltd.*, 605 F.3d 1330, 1339-42 (Fed. Cir. 2010); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008).

The ability to send messages to a particular network address is described in the specification as being necessary to the claimed invention: "As described above, the subscriber ***must*** have a converter 14 connected to the network 17.  Converter 14, as illustrated in FIG. 2, receives information ***addressed with the converter's network address via a known addressable data receiver 22***." '516 patent at 4:36-40.[6]  The Background of the Invention recites that the ability to selectively distribute messages is a defining aspect of the claimed invention, stating: "It is an object of the present invention to provide a method and system for ***dynamically distributing commercial programming to selected target households***.  It is another object of the invention to ***distribute commercial programming to particular subscribers*** based on predetermined characteristics.  In accordance with the present invention, a system and method are provided for ***distributing commercial messages to an individually addressable subscriber terminal*** ('converter') on a network." *Id.* at 1:56-65.  "[T]he patentee here has clearly indicated via the specification . . .  that the invention provides, as an essential feature, [selectively distributing messages].  It is therefore appropriate to construe the claims so as to ensure that they, too, require that feature." *MBO Labs., Inc. v. Beckton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007).

Invidi's argument that "[t]he phrase 'for selectively distributing' is not a structural element of the invention" is incorrect.  *Supra* p. 4.  The complete preamble of Claim 1, for example, says: "In a system for selectively distributing messages over a communications network, said system including a source of commercial messages, and a controller

---

[6]      Unless otherwise noted, all emphases are added.

communicating over the network with a plurality of subscriber terminals in a plurality of subscriber households served by the communications network and controlling the transmission of the commercial messages from the source to the subscribers households over the network, each of the subscriber terminals having a network address, the combination of: . . ." '516 patent at 9:59-67. As discussed above, the "system for selectively distributing messages" is the only means provided in the patent for delivering messages to subscriber households after they have been "select[ed] . . . for transmission to at least one of the subscriber terminals" and "identif[ied] . . . with the network address of said at least one subscriber terminal," as recited in the claims, and the claimed invention would not be able to achieve its stated purpose without the "system for selectively distributing messages." Accordingly, the claimed invention would be inoperative without the preamble, and "[i]n a system for selectively distributing messages" imposes structural limitations on the claim.

Indeed, although the claims do not use express "wherein the improvement comprises" language, they are generally written in "Jepson format" using the preamble "to recite elements or steps of the claimed invention which are conventional or known." *Rowe v. Dror*, 112 F.3d 473, 479 (Fed. Cir. 1997). All of the elements in the preamble of the claim are disclosed in U.S. Patent No. 5,260,778 to Kauffman ("Kauffman '778 patent") (JA-12 to JA-21), which was incorporated by reference in the '516 patent. '516 patent at 1:41-55. "When this form is employed, the claim preamble defines not only the context of the claimed invention, but also its scope." *Rowe*, 112 F.3d at 479; *see also Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed. Cir. 2002). The '516 patent relies on this language to distinguish it from the '778 patent and to define the scope of the actual invention, thus transforming the preamble into a claim limitation. *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d at 808-09

14

(Fed. Cir. 2002).   Invidi's cases are inapposite.   In *Altiris, Inc. v. Symantec Corp.*, the Federal Circuit determined that the preamble was duplicative of requirements in the body of the claim. 318 F.3d 1363, 1372 (Fed. Cir. 2003).   Similarly, in *Schumer v. Laboratory Computer Systems, Inc.*, "the language of the preamble [was] superfluous."   308 F.3d 1304, 1310 (Fed. Cir. 2002). That is clearly not the case here, where the body of the claims does not describe what happens to the commercial messages once they have been addressed, and the preamble is "necessary to give life, meaning and vitality" to the claims.   *On Demand Machine Corp.*, 442 F.3d at 1343 (quoting *Kropa v. Robie*, 187 F.2d 150, 152 (C.C.P.A. 1951)).

The plain language of the term "selectively distributing…" in the claims supports Defendants' construction.   "Selectively," as a simple matter of English grammar, modifies "distributing," meaning that the way messages are distributed (sent or delivered) must be selective.   *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008) ("[W]ords, in context, receive their meaning according to their placement in grammatical structure.").   Accordingly, Defendants' construction makes clear that it is the distribution that is selective by requiring "sending each specific message only to the one or more network addresses selected to receive that message. . . ."   Invidi's construction, in contrast, does not require that the "delivering" be selective, so long as the messages are "received and displayed by selected subscriber terminals."

The structure of the claims as a whole further supports Defendants' construction.   *See Middleton, Inc. v. Minnesota Mining and Manufacturing Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002) ("the most important indicator" of a term's meaning as would be understood by a person skilled in the art is the "usage and context in the claim itself.").   The final requirement of each claim includes "identifying the selected at least one commercial message with the network

15

address of said at least one subscriber terminal." *See, e.g.*, '516 patent at 10:10-13. The purpose of identifying the selected commercial message with the network address of the subscriber terminal is that it allows the claimed invention to selectively distribute messages, by sending each specific message only to the one or more network addresses selected to receive that message.

The specification also supports Defendants' construction and the only means it discloses for selective distribution of messages is by addressing messages and using a known addressable converter. For example, it states that "commercial messages are then transmitted over the network for receipt and display by a television receiver connected to the ***addressed converters***." '516 patent at 2:3-6. "Converter 14, as illustrated in FIG. 2, receives information ***addressed with the converter's network address*** via a known addressable data receiver 22." *Id.* at 4:37-40. "[T]he local distribution center produces converter addresses to communicate directly with subscribers." *Id.* at 9:19-21. Moreover, Invidi's claim that "Defendants first try to shoehorn in the concept of a 'network address'" and improperly "read in" network addresses to "selectively distributing" (*Supra* pp. 6-7) misses the point. Invidi's proposed construction purportedly comes from the Abstract, which states that a server "transmits the messages on the network to be received and displayed ***by the addressed converters***." (*Supra* p. 5).[7] But Invidi has conveniently dropped from its construction the notion that the only converters that receive and display a message are the ones that are ***addressed*** by the message, ignoring the clear teaching and purpose of the patent.

---

[7]     The usefulness of looking to the Abstract of the patent, rather than the full specification it is abstracting, is itself doubtful. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) ("To begin, this statement is in the Abstract of the patent. This section of a patent speaks generally to the invention and, much like the syllabus of an opinion, sets forth general information about the document's content, which is described in more detail in the remainder of the document.")

Invidi argues that "Defendants seek to limit the term in ways that go far beyond what the simple words 'selectively distributing' can support." *Supra* p. 9. But when the specification consistently describes a term in one manner, broader interpretations of the term that are unsupported by the specification should be rejected. *See Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1333 (Fed. Cir. 2005) ("Because this construction is driven by the use of [the term] in the context of the claim and is supported by the written description, a broader construction that lacks support in the intrinsic record must yield.").

And while Invidi spends numerous pages describing how addressable advertising works "[i]n a cable network" and claims that "[t]he patent describes 'selective distribution' of programming on a traditional cable television system," Invidi does not actually cite to any portion of the patent, because the patent nowhere provides such a description, let alone identifies it as "selective distribution." *Supra* pp. 1-2, 5-8. Indeed, Invidi claims that figure 5 of the patent illustrates components of a traditional cable system (*Supra* pp. 1-2), but the specification in fact describes figure 5 as illustrating "a wide area network" and never identifies it as a traditional cable system ('516 patent at 2:29-30, 8:65-67).[8] The second figure on page 2 of Invidi's brief, the description that "local distribution centers (also called hubs) would each have cables leading to the set top boxes in consumers' homes," and the description that "all four households are viewing the same channel, but two household are viewing a car advertisement at

---

[8]     A "wide area network" (WAN) is a generalized term describing a "network whose devices may be distributed over large distances and the links are formed using telephone lines, radio and microwave links or satellites." Chambers Dictionary of Science and Technology (1999). By contrast, a "cable television system" (CATV) is a specific term denoting a "television broadcasting system in which television signals are relayed directly to individual subscribers by means of underground or overhead cables, as opposed to being broadcast by radio waves." *Id.* The key distinction is that a WAN encompasses packet switched networks and node-to-node type networks while CATV exclusively refers to broadcast or hub-and-spoke type networks.

17

the same time two other households are viewing an Xbox advertisement" are nowhere to be found in the '516 patent and come solely from Invidi. *Supra* p. 2.

In reality, the specification states that the "network disclosed preferably uses high speed packet switching technology, preferably [asynchronous] transfer mode switching (ATM) of a known type." '516 patent at 2:39-41. Packet switched networks allow information to be routed to a particular address, rather than broadcast to all set top boxes as in a traditional cable system. Indeed, a primary benefit of ATM is that it allows digital information to be routed to individual customer terminals. *See, e.g.*, VISIBLE00036111 ("A ***switching*** and transport protocol that allows data, voice, and video to be carried over a single physical network. ATM is ideal for interactive applications that require ***dynamic routing*** and resource allocation.") (JA-74). The specification clearly states that "commercial message schedule 31 determines which messages will be sent to each household, and server 10 will do so by ***embedding routing information*** from database 34 in its bit stream. Thus, ***each commercial message will have appropriate routing information associated with it***." '516 patent at 3:56-62. And the specification also discloses that the addressable data receiver "strip[s] off all ***control*** and ***framing*** information (including ***routing*** information)" after a message addressed to the receiver is received. *Id.* at 4:43-49.

Invidi's argument that Defendants' construction excludes a preferred embodiment (*Supra* p. 6) is specious. It is true that the patent specification says that the claimed invention "can also provide analog or digital, real time programs 35, such as broadcast programs and cable programs." '516 patent at 3:3-5. But it does not say that those programs are provided over a traditional cable system. *Id.* Cable programs, whether prerecorded or real-time, can also be provided over other types of networks, including the addressable network disclosed in the patent and cited prior art.

18

Invidi's claim that the patent "cites to prior art describing 'selective distribution' on traditional cable television systems" (*Supra* p. 6) is misleading, and its claim that the prior art did so by "broadcasting media and instructing selected terminals to display the media" (*id.*) is simply incorrect.  The referenced Kauffman prior art is perhaps one of the best sources of information regarding the correct construction of "selectively distributing…" because it was incorporated by reference into the '516 patent and discloses an "apparatus for *selective distribution of messages over a communications network.*" '516 patent at 1:41-55; *see also, e.g.*, *Harari v. Holmer*, 602 F.3d 1348, 1353 (Fed. Cir. 2010) (a patentee may incorporate a patent by reference to satisfy the written description requirement).  Indeed, the only place the specification of the '516 patent explicitly mentions "selective distribution" is in its discussion of the Kauffman patent.  Where a patentee cites or relies on prior art, the prior can have particular value in claim construction both in determining the meaning of the term to a person skilled in the art as well as an indicator that the patentee intended to adopt that meaning.  *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).

Kaufmann does not, however, describe selective distribution on a traditional cable television system by indiscriminately broadcasting media and instructing selected terminals to display the media, as Invidi would have it.  Indeed, Kaufmann distinguishes the prior art by stating that "[i]n the past, however, use of the communications network for transmitting messages to subscribers has been limited, and any such communications attempted have been on a global basis to all subscribers at the same time."  Kauffman '778 patent at 1:25-28.  Accordingly Kauffman states that "[i]t would be advantageous to provide for the distribution of *specific messages to individual subscribers or special groups of subscribers* via a CATV

communications network or the like."[9]   *Id.* at 1:41-44.   Then throughout, Kaufmann describes using an addressable controller and addressable converters to send specific messages to network addresses selected to receive that message using an out-of-band network.   *See, e.g., id.* at 4:16-21 ("In past systems, addressable controller 24 transmitted address and control data to subscriber converters via a ***separate FM data path*** carried on the network.   In accordance with the present invention, ***the same data path may be used for communication of text and graphics messages***.");   *see also id.* at 4:51-65, 5:28-47, 8:5-42.

Kaufmann also further refutes Invidi's notion that "selectively distributing media on a cable system is accomplished by broadcasting a message and telling certain selected set top boxes to receive the message" and that "HBO is selectively distributed to those households who subscribe to that premium movie channel."   *Supra* p. 8.   As Kauffman states: "At the cable system headend, an addressable controller 24 enables the system operator to ***communicate with individual subscriber converters***.   In the past, addressable controllers have been used at the headend primarily to ***authorize or deauthorize individual converters*** to receive premium signals. The addressable controller maintains a database of all subscribers in the system.   The database contains information including service authorizations and converter address data for each subscriber."   Kauffman '778 patent at 3:49-58.   In traditional cable television systems, authorization messages were sent to individual converters using the out-of-band network, in other words, authorization messages were selectively distributed.   Premium programming itself, however, was not selectively distributed, it was broadcast in-band and encrypted.

---

[9]      Invidi complains that the inclusion of "each specific message" in Defendants' construction is ambiguous.   *Supra* pp. 7-8.   That language comes from this portion of Kaufmann and simply means that each specific message is addressed to one or more converters.

Invidi's construction reflects a cherry-picked portion of a sentence from the Abstract out of context, and was chosen for the sole purpose of trying to encompass the accused systems. Because Defendants' proposed construction is consistent with the express language of the claims, and respects the teachings of the specification and the incorporated prior art, Defendants construction should be adopted here.  The claim term "selectively distributing messages over a communications network" means "sending each specific message only to the one or more network addresses selected to receive that message over a communications network."

### 3.    Plaintiff's Reply Position

### i.    This Preamble Term Is Not Limiting Because It Merely States A Purpose

The Defendants ignore the structure of the asserted claims.  For example, claim 1 begins: "**In a system for** selectively distributing messages over a communications network, **said system including** . . . [the environment]. . . **the combination of** . . . [the claim body]."[10]  The clause "**for** selectively distributing" in the preamble is not structural because it merely recites the purpose of the system. *Marrin v. Griffin*, 599 F.3d 1290, 1294 (Fed. Cir. 2010) ("preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim"); *see also Catalina Mktg Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention") (internal quotes omitted).  That purpose is to provide targeted messaging—that is, certain households get certain messages while other households get other messages.

---

[10] Emphasis added throughout unless otherwise stated.

After the "for selectively distributing" clause, the preamble specifies the surrounding environment (the text between "including" and "the combination of") and then the body of the claim (after "the combination of") recites the claimed combination, which enumerates the structural elements.

There is no basis to read in the narrow purpose proposed by the Defendants, no basis to read "packet switching" into that purpose as the Defendants suggest, and no basis to make that purpose a limitation of the claims.

Nonetheless—even though the "selectively distributing" clause is not limiting, should the Court choose to construe this phrase, it should be construed to mean "delivering messages such that they are received and displayed by selected subscriber terminals."  In other words, "selectively distributing" simply means targeted advertising.

### ii.     Defendants Construction Is Wrong Because It Would Redefine How The Art Uses The Term "Selectively Distribute"

The Defendants acknowledge that "selective distribution" is a prior art term cited in the "background" section of the '516 patent.  Accordingly, it is undisputed that the "selectively distributing" phrase was not added to distinguish prior art.  It is thus broad.

The '516 patent cites to the prior art Kauffman patent,[11] which was entitled "Apparatus For Selective Distribution Of Messages Over A Communication Network."  Kauffman discloses selective distribution in a **traditional cable system**: "Various communications networks, including **cable television (CATV)**, subscription television (STV) and direct broadcast satellite (DBS) systems **are available for distributing television programming for** entertainment, weather, news and **advertising**." (Kauffman, 1:11-15).  Defendants' construction contradicts this term's meaning in the art, as well as the patentee's adoption of this meaning.

---

[11] U.S. Patent No. 5,260,778 to Kauffman ("Kauffman").  Attached JA-12 to JA-21.

It is Defendants' position that cable systems are incapable of "selective distribution" of advertisements because they broadcast their content.  Defendants are wrong because Kauffman specifically discloses selective distribution within a traditional cable network.   This "selective distribution" occurs in cable systems even though all content is broadcast down the cable and is physically accessible to all set top boxes connected to the cable.  Indeed, Kauffman specifically states that the microprocessor in each set top box receives all messages (which are broadcast to everyone) and "interprets the distribution data to determine whether the message is intended to be processed by the subscriber terminal."  (Kauffman, 5:36-37).  Kauffman further states: "If a message is not directed to the particular converter, it is ignored."  (*Id.*, 5:37-38).  Thus, the art discloses "selective distribution" in a cable environment when the cable system **broadcasts** messages that are received and displayed by selected set top boxes and ignored by others (like Defendants' system).[12]

### iii.  Defendants' Proposed Construction Improperly Reads Out Embodiments Disclosed In the Specification

Although the '516 patent teaches targeted advertising in the cable environment, Defendants seek to exclude this embodiment.  Specifically, Defendants point to one embodiment (an "ATM" network as discussed in Defendants' brief) but ignore the traditional cable network embodiment in an attempt to get a narrower construction.  The cable network embodiment, however, is most relevant here because the Defendants' infringing household targeted advertising system operates within a traditional cable network.  Defendants' narrow construction excludes this taught embodiment.  Because constructions that exclude embodiments are almost

---

[12] Defendants state that Invidi is incorrect, but ignore the critical passages of Kauffman discussed by Invidi.  The cable network in Kauffman **broadcasts** the messages on the special message channel for all set top boxes to see, and includes instructions in the broadcast telling each set top box whether to play the message.  This technique of broadcast with instructions allows "distribution of specific messages to individual subscribers or special groups of subscribers via a CATV communications network." (*See supra* pp. 19-20).

always improper, Defendants' are wrong.  *See, e.g., Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007) (noting that Courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification").

Ironically, after accusing Invidi of "cherry picking," Defendants argue that the patent is limited to "ATM" or "packet switched" networks—terms that are only mentioned once in the '516 patent.  (2:39-41).  Notably, immediately following this single mention, the patent states that "any number of conventional high speed networks could be used."  (2:41-43).  Indeed, Figure 5 discloses a traditional cable network as one of these "conventional high speed networks."  *See* Figure 5.[13]

Cable networks, by design, send content down a cable to everyone physically connected to the cable.  In this sense, cable networks "broadcast" all information on a particular cable segment.  That is, the information is physically available to set top boxes connected to the cable:



Nonetheless, advertising may be "selectively distributed" to various households by instructing different households to receive and display different advertising.  In above graphic, the first and

---

[13] Visible World's CTO, for example, admitted that the term "head end" found in Fig. 5 is only associated with cable networks. (JA-47, Niemeijer Tr., 59:7-20).

third houses play a car commercial at the same time the third and fourth houses play an Xbox commercial.  This is "selectively distributing"— different content is targeted to different users.

Typically, to selectively distribute advertisements in a cable system (where content is physically made available to everyone connected to the cable), a cable network puts the commercial messages on separate channels and tells each set top box where to tune to receive a selected commercial message.  From the above example, the car commercial may be broadcast on channel 400 and the Xbox commercial on channel 401.  Two of the set top boxes would then be instructed to tune to channel 400 while the other two would be instructed to tune to channel 401.

Indeed, the patent specifically describes this "selective distribution" process in a cable network.  The specification states that "server **10 transmits instructions** to each subscriber **controlling what channel** it should access for its next commercial message." (4:27-29).  Each commercial message is then placed on a "respective channel."  When a commercial break occurs, each set top box "is controlled to receive the commercial channel instructed by server **10**," and when the commercial break is over, the set top box reverts to its original channel:

> On a separate, preferably digital channel, server **10** transmits instructions to each subscriber controlling what channel it should access for its next commercial message. Server **10** routes each commercial message to a respective channel. When a commercial break is encountered in programming received by a subscriber, the subscriber's converter **14** is controlled to receive the commercial channel instructed by server **10**. When the commercial break is over, converter **14** reverts to **35** receiving the programming from server **10**.

(4:26-35).  In this embodiment, each set top box can receive and display selected commercial messages.  The system thereby directs certain messages "only to" certain set top boxes, and other certain messages "only to" other set top boxes even though all content is broadcast on the cable

25

and all content is physically on the cable and physically "available" to each set top box if the set top were instructed to receive and display it.  To the extent Defendants seek to exclude this embodiment from their claim construction, their construction cannot be correct.

Defendants also contend that advertisements must be "addressed" to specific set top boxes.  The claims do not require such "addressing."  Advertisements are directed to specific set top boxes, but are not in each situation "addressed."  Defendants' repeated reference to advertisements being "addressed" is inconsistent with both the claims and the specification, neither of which limit the invention in this manner.

Defendants also state that Invidi "knows" that they "distribute all advertisements to all customers."[14]  Discovery, however, has confirmed that Defendants broadcast multiple commercial messages down the cable and the set top boxes are instructed which message to receive and display.[15]  Selected set top boxes will receive and display each respective commercial message.  The set top boxes will ignore messages not destined for them.  Again, that is how cable systems selectively distribute according to the '516 patent and as practiced in the industry.[16]

Defendants also assert that the specification "clearly describes" a selective distribution system that works "by addressing the messages."  (*See Supra* 9).  While "addressed" commercial messages is one possible option, it is **not** the only option.  The Defendants cite column 4, lines 36-40, which does not actually mention addressing "commercial messages," but rather mentions

---

[14] Invidi is unsure what Defendants mean by this.  To the extent that the Defendants mean to imply that all set top boxes receive and process all advertisements, they do not.  Not one witness testified that the set top boxes receive and process all advertisements.

[15] Invidi does contend that households view every commercial physically transmitted.

[16] Defendants criticize Invidi for using HBO as an example of selective distribution. However, Visible World's CEO candidly admitted that HBO is "distributed" rather than "broadcast" in the purest sense because without the HBO key, the set top boxes will not play it. (JA-49, Haberman Tr., 258:12-259:5).

addressing more generic "information" which includes control information.  Also, Defendants

overlook the preceding paragraph which specifically discloses the embodiment in which

commercial messages are not "addressed," but instead are placed on separate commercial

channels to be selected by using control information that informs each set top boxes where to

tune for its commercial messages.  (4:26-35).

Defendants state that Invidi is "improperly" trying to "broaden" the claims to cover

systems that "do not address commercial messages to set top boxes." (*See supra* 9).  The

invention, however, **is** broader than "addressing" commercial messages and, as disclosed in

column 4, lines 26-35, one embodiment of the invention works by placing advertisements on

special channels and sending instructions to each set top box as to which advertisement to play.

Nothing in the claims limits the invention to "addressing" commercial messages.  Although

Defendants provide two examples of how "selectively distributing" might be implemented, they

conspicuously avoid presenting the cable system embodiment disclosed in the '516 patent, which

is admittedly the implementation used by Defendants.  (*See supra* 10-11).

The Defendants also criticize Invidi for citing the abstract of the patent even though the

Federal Circuit has repeatedly cited the abstract in support of various claim constructions, and

has done so after the case cited by Defendants.  *See, e.g.*, *iLOR, LLC v. Google, Inc.*, 631 F.3d

1372, 1378 (Fed. Cir. 2011) (analyzing abstract as part of specification).  Moreover, the abstract

is not the only reference to receipt and display of messages.  A similar statement is found in

column 2 of the patent:  "The commercial messages are then transmitted over the network **for**

**receipt and display** by a television receiver connected to the addressed converters."  (2:3-6).

Accordingly, should the phrase be construed at all, the proper construction of "selectively

distributing messages over a communications network"  is "delivering messages such that they

are received and displayed by selected subscriber terminals."  Likewise, Defendants'

construction should be rejected because it excludes the traditional cable network embodiment

disclosed in the specification, and therefore cannot be correct.

### iv.     The Defendants "Preamble" Cases Support Invidi's Position That A Statement Of Purpose Is Not Limiting

Even Defendants' cases recognize that the purpose in a preamble is not limiting.  *See*

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371-72 (Fed. Cir. 2003) (preamble non-limiting

because it "merely recites a purpose of the invention and does not add anything to the body of

the claims").  Likewise, the Defendants' own citation of *Catalina Mktg. Int'l* supports Invidi:

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim.  Conversely, **a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose** or intended use for the invention.

289 F.3d at 808 (internal citations omitted).  In *Catalina Mktg. Int'l*, the Court held that the

following statement of purpose in a preamble was **not** limiting: "A syste[m] **for** controlling the

selection and dispensing of product coupons at a plurality of remote terminals located at

predesignated sites such as consumer stores."  *Id.* at 805-06.

Likewise, *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir.

2006) does not compel a different result.  There, the preamble directly related to four of the

method steps.  Whereas here, Defendants admit that the preamble clause at issue relates to

subject matter outside the body of the claim: "the body of the claims does not describe what

happens to the commercial messages once they have been addressed . . . ." (*See supra* p. 15).[17]

---

[17] Of course, Defendants' short-hand is not entirely accurate.  The claim requires that a commercial message be identified with, or associated, with a network address.   That association happens in two steps:  Commercial messages are associated with categories and categories are

The Defendants also cite *Poly-America L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004), but that case confirms what Invidi has already stated—that necessary **structure** found in a preamble would be limiting.  A purpose is not structure.

The Defendants also argue that addressing commercials is "described as necessary to the invention."  (*See supra* 12).  It is not.  The cited passage states that an embodiment uses "addressable converters" that can receive "information addressed with the converter's network address."  Even assuming, *arguendo*, that this passage mandated an "addressable converter" for every embodiment, the passage does **not** require "commercial messages" to be addressed.  Indeed, the control information may be "addressed" permitting the "commercial message" to be placed on a special commercial feeder channel just as any other television program. (4:26-35)

The Defendants also argue that the "the claimed invention would be inoperative without the preamble."  This position is baseless.  Here is claim 1 without the preamble:

> 1.   [T]he combination of:
>
> a reservoir of data containing network addresses of the subscriber terminals and subscriber profile data associated with each of the subscriber households and including demographic data;
>
> selection means operatively associated with said reservoir for selecting at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least one subscriber terminal; and
>
> identifying means operatively associated with said reservoir for identifying the selected at least one commercial message with the network address of said at least one subscriber terminal.

This revised claim has three interrelated structural elements that perform the recited functions.

The Defendants have not explained why such a claim would be "inoperative."  Contrary to the

---

associated with network addresses.  The claims do not require that commercial messages "be addressed."

Defendants' arguments, the preamble clause at issue is superfluous.  *See American Medical Sys.,*

*Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1360 (Fed. Cir. 2010) (preamble not limiting where "the

language in the body of the claims recites a complete invention for achieving the state purpose"

and "removal of the duplicative preamble language would neither alter the scope of the claims

nor introduce ambiguity as to their coverage").

> **v.     The Defendants' "Jepson" Argument Is Wrong Because There Is No
> "Improvement Language" In the Claims**

The Defendants next argue that the asserted claims are all "improvement" "Jepson"-type

claims.  They are not.  A "Jepson" claim has a preamble that is concededly prior art and a

transition statement stating that the claim is an "improvement comprising" or equivalent

language.  No such "improvement" language is found in the claims of the '516 patent.  The

"Jepson" cases are not applicable. *Micron Tech., Inc. v. Tessera, Inc.*, 440 F. Supp. 2d 591, 596

(E.D. Tex. 2006) ("Rule § 1.75(e)(2) requires that Jepson claims employ 'a phrase such as

'**wherein the improvement comprises'**"); *see also* 37 C.F.R. § 1.75.

> **4.     Defendants' Sur-Reply Position**

"Selectively distributing messages over a communications network" is properly

construed to mean "sending each specific message only to the one or more network addresses

selected to receive that message over a communications network."  Invidi ignores the plain

meaning of "selectively distributing" and instead argues that the phrase does not actually require

selective ***distribution*** but only requires the selective "***recei[pt] and display***[]" of messages.

Nothing in the specification supports Invidi's contention.  *See Helmsderfer v. Bobrick Washroom*

*Equip.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("In this case there is only one ordinary meaning

attributable to the word 'partially' and this meaning does not include 'totally.' . . . Courts cannot

30

rewrite claim language."). The specification does provide extensive evidence supporting Defendants' proposed construction. *Supra* pp. 9-21.

Invidi's argument regarding Kauffman ignores that it describes distribution that is, in fact, *not* selective. Indeed, Kauffman states that "use of the communications network for transmitting messages to subscribers has been limited, and any such communications attempted have been on a global basis to all subscribers at the same time." *Supra* pp. 20.[18]

Contrary to Invidi's statements (*Supra* pp. 23-28), Defendants' proposed construction merely requires that the cable television network be used to "selectively distribute" messages, rather than broadcast the messages to all subscribers, as was "traditionally" implemented in a cable television network.[19] For example, one method of "selectively distributing" messages in a cable television network—using addressable converters—is described in Kauffman. Invidi cites no prior art where broadcasting messages to all subscribers, after which the subscribers' set top boxes tune to a particular message based on previously sent information, is described as "selective distribution."[20] Kauffman does not state that "all content is broadcast down the cable and is physically accessible to all set top boxes connected to the cable," as Invidi would have it

---

[18] Invidi argues "selective distribution" should be broadly construed because it was known in the prior art. *Supra* p. 22. Invidi provides no support for this proposition.

[19] Contrary to Invidi's assertion (*Supra* p. 24), Defendants do not argue that the patent is limited to ATM or packet switched networks.

[20] Indeed, in the prosecution of a related European patent application, the applicant attempted to distinguish the claimed invention over the prior art with this principle, arguing that "the fundamental issue relating to the current invention . . . is that control of the volume of information distributed is achieved by selecting appropriate material to be sent to a specific subscriber only." JA-54; *see also id.* ("Notably, the fact that even if [in the prior art reference] the head end sent a signal to the subscriber apparatus to identify which channel should be operated for a particular subscriber (i.e. has decided which commercials is to be viewed by a subscriber), it still did not address the problem of the need to send all commercials to that particular subscriber requiring use of multiple available channels for each of those commercials.")).

(*Supra* p. 23).   Indeed, Kauffman represents an improvement over cable networks that only allowed the distribution of messages "on a global basis to all subscribers at the same time."[21]

Just as the majority of vehicles on the roads are cars, most content distributed over cable networks is broadcast to all users.  But, not *all* vehicles on the roads are cars, and, similarly, not *all* content distributed over a cable network is broadcast to all users.  Video-on-demand content is the most well-known example of content that is *not* broadcast to all users but is instead "selectively distributed."[22]   Another example is "switched digital video," where specialty channels are distributed to customers only upon demand.[23]   Invidi's premise that "selective distribution" necessarily includes content which is broadcast to all users is wrong.

Moreover, the specification of the '516 patent is filled with discussion that supports Defendants' position that "selective distribution" is, in fact, "selective."   For example, immediately preceding the passages from the specification quoted by Invidi is a discussion of a "***commercial routing database*** 33 which includes ***information about required routing*** of commercial messages."   '516 patent at 3:63-4:1.   This database would serve no purpose if, as Invidi would have it, messages are not routed but are broadcast to all subscribers.   *See, e.g.*, '516

---

[21] Invidi again argues that Figure 5 of the '516 patent must be a "traditional cable network." *Supra* p. 24.   The only new argument Invidi makes is that Visible World's (VW) CTO purportedly "admitted that the term 'head end' found in Fig. 5 is only associated with cable networks." *Id.*   The testimony of VW's CTO is not relevant to claim construction. *Cf. Symantec Corp. v. Computer Assocs. Int'l*, 522 F.3d 1279, 1291 (Fed. Cir. 2008) (disregarding expert testimony that "simply recite[d] how each expert would construe [a] term . . . based on his own reading of the specification" because it did "not identify the 'accepted meaning in the field' to one skilled in the art").   Moreover, VW's CTO merely testified that he was only aware of its use in the context of cable systems.   The term is used with many types of cable television networks and is also used to refer generally to telecommunications gateway. *See, e.g.*, http://en.wikipedia.org/wiki/Cable_television_headend ("One can also find head ends in . . . Internet communications networks.").

[22] Video-on-demand content is "narrow-cast," meaning that a given video-on-demand asset is selectively distributed only to the set-top-boxes within a particular "service group" and not to subscribers in other service groups.

[23] *See, e.g.*, http://en.wikipedia.org/wiki/Switched_video.

patent at 3:56-62.  The specification discusses selectively sending messages to households, not selectively displaying messages.  Invidi's proposed construction would read out these functions.

For the first time in its Reply Brief, Invidi argues that a paragraph in column 4 of the '516 patent specification describes selective distribution on a cable television network by broadcasting content to all subscribers on different channels and transmitting instructions regarding which channels to tune to.[24]  *Supra* pp. 25-26.  Read in context, however, that paragraph does not refer to selective distribution but instead describes a process where the relevant server, server 10, has relinquished control and the claimed invention is not being used.  *See* '516 patent at 4:9-12.  The paragraph quoted by Invidi refers to this scenario and indicates that "[w]hen the commercial break is over, converter 14 reverts to receiving the programming from server 10."  '516 patent at 4:34-35.  Moreover, to read this paragraph as describing "selective distribution" would be inconsistent with the portions of the specification discussed above and in Defendants' Ans. Brief.

Invidi's arguments that the term "selectively distributing messages over a communications network" is not limiting because it "merely recites the purpose of the system," misses the point.  (*Supra* pp. 21-22, 28-30).  The preambles in this case recite, for example, "*In* a system for selectively distributing messages . . . ."  '516 patent at 9:59.  This term does not

---

[24] Invidi contends "that is how cable systems selectively distribute according to the '516 patent and as practiced in the industry" and that "[VW's] CEO candidly admitted that HBO is 'distributed' rather than 'broadcast in the purest sense because without the HBO key, the set top boxes will not play it."  *Supra* p. 27 and note 15.  The testimony of VW's CEO is not relevant to claim construction, and moreover, he was not testifying in the context of the patent.  In a letter to John Carles, the alleged inventor of the '516 patent, in response to an allegation that Invidi infringed the '516 patent, Invidi's Chief Technology Officer and Chief Scientist candidly admitted that "[t]he system covered by the '098 and the '516 patents is a centrally controlled system where commercial messages are modified by adding routing information so that the commercial message is *only* broadcast to a specific home or set of homes *identified in advance* by a system *in the head end or central location*."  JA-66 (emphasis in original).  Mr. Carles acquiesced to this description.

merely state the purpose of the claim elements found in the body of the claim.  It recites the environment in which those claim elements are required to operate.  *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374-75 (Fed. Cir. 2008) (where a preamble recites the physical structures of a system in which a claimed method is practiced, direct infringement is "clearly limited" to practicing the claimed method in that environment).  A "system for selectively distributing messages" is a physical structure, not a mere purpose.  By contrast, the cases cited by Invidi all have claims with simple forms of, or similar to, "a system for [purpose] comprising: [the claim body]."  *See, e.g.*, *Marrin v. Griffin*, 599 F.3d 1290, 1292 (Fed. Cir. 2010) ("1. A Scratch-off label for permitting a user to write thereon without the use of a marking implement, comprising: . . .").  Accordingly, "In a system for selectively distributing messages over a communications network . . ." is required by the claims, and "selectively distributing messages over a communications network" should be construed.  None of the cases cited by Invidi compel a different result.

Invidi also incorrectly claims that Defendants' argument that "the claimed invention would be inoperative without the preamble" is "baseless" because the body of the claim "has three interrelated structural elements that perform the recited functions."  But, the preamble provides the only means in the patent for delivering messages to subscriber households after the recited functions in the body of the claim have been performed.  *Supra* pp. 13-14.  The cases holding that the preambles of *Jepson* claims are limiting are thus applicable because they illustrate that a preamble is limiting when it is used to define the scope of the claimed invention. *See Rowe* v. *Dror*, 112 F.3d 473, 479 (Fed. Cir. 1997).  Invidi has not provided any reason that the asserted claims should not be treated the same as *Jepson* claims where the claims have a similar structure.

B.      "Commercial messages"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "commercial messages" | No construction necessary / alternatively, advertisements | Prerecorded media file |

1.      Plaintiff's Opening Position

Invidi contends that the term "commercial messages" has a well understood ordinary meaning and does not need to be construed.  The jury should be instructed, if at all, to use the term's ordinary meaning.  Indeed, anyone who has ever watched television knows the ordinary meaning of "commercial messages." Alternatively, if the Court believes a construction is necessary, Invidi proposes that the term "commercial messages" be construed to mean "advertisements."

The Defendants' proposed construction is clearly incorrect.  A claim term is presumed to carry its ordinary and customary meaning in the art.  *Phillips v. AWH Corp.*, 415 F.3d at 1312-13.  This strong presumption is subject to two exceptions.  First, the patentee may be his or her own lexicographer and define a term in the specification of the patent.  Second, the patentee may have made some disavowal of claim scope during prosecution.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (claim terms to be interpreted more narrowly than ordinary meaning only when (1) "a patentee sets out a definition and acts as its own lexicographer" or (2) "disavows the full scope of a claim term either in the specification or during prosecution.").  Neither exception applies here.  The first exception does not apply because the term "commercial messages" is not defined in the patent or given a special meaning. The second exception does not apply because the patentee did not clearly disavow claim scope by using the term "commercial messages."

35

It is unclear what Defendants mean by "prerecorded media" or, more importantly, why those terms would aid the jury in understanding the very common and ordinary phrase "commercial messages."  Also, the inclusion of "files" in the Defendants' construction is not correct.  There is nothing in the patent that requires that commercial messages be "files."  In fact, such a construction is inconsistent with the patent specification.  The patent teaches that commercial messages may be added to a cable broadcast stream, which is not sent as "files:" "[S]erver 10 . . . can also provide analog or digital, real time programs 35, such as broadcast programs and cable programs . . . .  In addition to providing programming information in its transmission stream, server 10 also provides commercial messages . . . ."  (3:2-19).

The term "commercial messages" does not require construction.

## 2.      Defendants' Answering Position

The term "commercial messages" is properly construed to mean "prerecorded media files."  Defendants' construction is driven by the specification and the plain language of the claims themselves.  Invidi suggests that the term "has a well understood ordinary meaning and does not need to be construed," or in the alternative, should have the vague, ambiguous, and overly broad construction of "advertisements."

It is well-established that construing the claims of a patent is the province of the court, not the jury.  *Alloc, Inc. v. Pergo, Inc.*, Nos. 2009-1107, 2009-1122, 2010 WL 661253 at *2 (Fed. Cir. Feb. 25, 2010) ("Claim construction has always been a legal issue for the court and not within the fact-finding role of a jury."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("[I]n a case tried to a jury, the court has the power ***and obligation*** to construe as a matter of law the meaning of language used in the patent claim.").  "[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury.  In order to fulfill this obligation, the court must see to it that disputes concerning the scope of the

36

patent claims are fully resolved." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009). The Federal Circuit has thus admonished, time and again, that it is error for the district court to allow the jury to even consider disputes over claim scope. *See, e.g.*, *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 n.6 (Fed. Cir. 2008); *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008); *Medicis Pharm. Corp. v. Actavis Mid Atlantic LLC*, Civ. A. No. 11-409-LPS-CJB, 2012 WL 2126873 at *5 (D. Del. June 12, 2012).

Here, there is a fundamental dispute regarding the scope of the claims. Defendants contend that the claims require that the actual prerecorded media files, which constitute commercial messages, be "select[ed] . . . for transmission to at least one of the subscriber terminals" and be "identif[ied] . . . with the network address of said at least one subscriber terminal" as recited in the claims. In its infringement contentions and claim construction briefing, Invidi has indicated that it intends to argue to the jury that the claims do not require actual files in those steps, but rather just that an "advertisement" as an abstract concept be selected for transmission and identified with a network address. *See, e.g.*, s*upra* p. 26 ("There is nothing in the patent that requires that commercial messages be 'files.'"). Accordingly, the term "commercial messages" requires construction.

Defendants' proposed construction is consistent with the use of the term "commercial message" in the patent specification, where it is used to refer to an actual media file, and in the claims. *See Pause Tech*, 419 F.3d at 1333 (Fed. Cir. 2005) ("Because this construction is driven by the use of [the term] in the context of the claim and is supported by the written description, a

broader construction that lacks support in the intrinsic record must yield."); *Outside Box Innovations, LLC* v. *Travel Caddy, Inc.*, 2008 WL 145247 at *3-4 (Fed. Cir. Jan. 15, 2008).  For example, the specification states that "Server 10 accesses a ***prerecorded digital library*** 32 which is comprised of prerecorded programs in a compressed digital or other storage formats" and that it also "has access to a library of ***commercial messages*** 38, which contains all of its ***commercial messages stored in a convenient format***."  '516 patent at 3:5-7, 3:19-21.  It goes on to state that ***"[e]ach commercial message is a 'smart commercial'***, in that it contains embedded information identifying the categories of recipients for the message."  *Id.* at 3:21-24.  Every instance where the specification refers to a commercial message or commercial messages, it is referring to actual "prerecorded media files."  *See id.* at 1:62-2:6, 2:43-47, 3:16-28, 4:66-5:7, 9:23-36.  Similarly, when used in the claims, the term "commercial messages" is clearly referring to actual files that are, *e.g.*, transmitted.  *See id.* at 9:60-66, 10:5-9, 10:43-47, 11:9-13, 11:32-38, 12:1-4, 12:24-30, 12:36-39.

Invidi's argument that Defendants' construction is inconsistent with the specification (*Supra* p. 36) is incorrect.  A file can be streamed.  The specification states that the server can "incorporat[e] commercial messages in its transmission stream."  *Id.* at 3:29-30.  There is nothing inconsistent with incorporating a prerecorded media file into a transmission stream.

Invidi's cases are inapposite.  Defendants' construction of "commercial messages" is consistent with the term's ordinary and customary meaning to a person of skill in the art.  Moreover, as the Federal Circuit has stated, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Medrad, Inc. v. MRI Devices Corp.*, 401

38

F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *V–Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention"); *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

Invidi's proposed construction of "advertisement" is overbroad. Invidi says that "anyone who has ever watched television knows the ordinary meaning of 'commercial messages'" (*Supra* p. 35), but the ordinary meaning of "commercial" is not the same as the technical meaning of "commercial messages" to a person of ordinary skill in the art. Invidi's construction is so vague as to deprive the term of meaning. Invidi seeks to argue to the jury that all the claims require is the selection for transmission and identification with network addresses of "advertisements" as an abstract concept. That construction finds no support in the specification, which does not even use the word "advertisement," and should be rejected.

The claim term "commercial messages" means "prerecorded media files" and Defendants' proposed construction should be adopted.

### 3.      Plaintiff's Reply Position

Defendants argue that their construction flows from the specification and the plain language of the term. The plain meaning of "commercial messages" is "advertisements." Defendants cite no dictionaries, treatises, or other sources showing that one of ordinary skill in the art would consider a "commercial message" to be a "prerecorded media file."

Nor does the specification support Defendants.  First, the '516 patent states that a "data stream" is sent down the network medium.  (2:48-51 and 3:38-40).  There is no requirement that the "data stream" be "files."  In fact, the data stream could be analog (such as what would be played from a video tape).   "Server 10 accesses a prerecorded digital library 32 which is comprised of prerecorded programs in a compressed digital **or other storage format**.   For example, the programs may be stored on different types of known storage media, such as CD ROM, laser disk, or **magnetic tape**." (3:4-10).  The '516 patent does not state that commercial messages are stored as files or transmitted as files.  Indeed, the '516 patent does not use term "file."  Defendants have no support for their statement that "every instance" where commercial messages are referenced, the specification "is referring to actual 'prerecorded media files,'" because in **no** instance are commercial messages referred to as "prerecorded media files."[25]  In sum, because the patent does not use the term "commercial messages" in a special or unique way, the term's ordinary meaning must therefore control.[26]  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005).

### 4.    Defendants' Sur-Reply Position

The term "commercial messages" is properly construed to mean "prerecorded media files."  Invidi complains that "Defendants cite no dictionaries, treatises, or other sources showing that one of ordinary skill in the art would consider a 'commercial message' to be a 'prerecorded media file.'"  *Supra* p. 40.  Invidi not only cites "no dictionaries, treatises, or other sources" in support of its construction, but also fails to cite to the specification in support of its proposed

---

[25] Defendants also state that the "technical meaning" of "commercial message" is different from the ordinary lay meaning.  There is no basis for this assertion.  The "commercial messages" of the patent are the same commercial messages we all see on the television.

[26] Moreover, it is unclear why Defendants want this construction.  The patent is broader than "prerecorded media files," but regardless, Visible World's CTO already testified that Visible World stores its commercial messages as "prerecorded media files."  Accordingly, this is not a basis for arguing non-infringement. (JA-46, Niemeijer Tr. 11:4-20).

construction.  Unlike Invidi, Defendants' proposed construction is grounded in the use of the term "commercial message" in the specification.

Invidi seeks to construe "commercial messages" as abstract "advertisements," so that Invidi can argue infringement even though the *actual* commercial messages, the audio and video, that are broadcast are never "select[ed]" based on subscriber profile data nor "identif[ied]" with network addresses of set top boxes as required by the claims.[27]  Commercial messages cannot simply be advertisements where, for example, they contain "embedded [recipient] information" used by the CMMS 11 to "produce a set of subscriber addresses."  *See* '516 Patent at 3:21-28.

Invidi assumes that a "magnetic tape," as mentioned in the specification, is necessarily analog video tape.  Yet the portion of the specification quoted by Invidi makes clear that the tape is digital; stating that "magnetic tape" is storage media that can be used to store the "prerecorded digital library."  *Supra* p. 40.[28]  A construction of "prerecorded media files" is thus not inconsistent with the use of streams.  *Supra* p. 39.  Moreover, neither Invidi nor the specification explains how an embodiment *without* prerecorded media files would work.

### C. "Network Address"

| Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "network address" | An address specified by networking protocols | A label representing a specific location on a network, which can be used to route messages to that specific location |

---

[27] Regardless whether the accused systems include commercial messages, the claims do not just require commercial messages.  They require that commercial messages be "select[ed]" based on subscriber profile data and "identif[ied]" with network addresses of subscriber terminals.
[28] "Magnetic tape data storage uses digital recording on to magnetic tape to store digital information."  http://en.wikipedia.org/wiki/Magnetic_tape_data_storage (accessed Jan. 2, 2013).

### 1.      Plaintiff's Opening Position

In the patent, set top boxes are "addressable converters."  The patent explains that "the subscriber must have a converter 14 connected to the network 17.  Converter 14, as illustrated in FIG. 2, received information addressed with the converter's network address via **a known addressable data receiver**."  (4:36-40).  Consequently, addressable data receivers, and their network addresses, predate the invention.  Because the patent does not offer a special definition of the term "network address," the term should receive its ordinary meaning.

At the time of the invention, there were a variety of networking standards and each specified network addresses used to identify components on the network.  For example, the Ethernet standard, promulgated by the Institute of Electrical and Electronic Engineers ("IEEE") in 1980, specified a MAC Address for identifying networking components on an Ethernet network.  MAC addresses are used with other networking protocols as well.  Another type of network address is an "IP" address which is now in ubiquitous use in the Internet.  RFC 791, Internet Protocol – DARPA Internet Program Protocol Specification (1981) at 2, available at: http://tools.ietf.org/pdf/rfc791.pdf .  The patent claims do not limit or restrict the type of network address used in the invention.  For example, it could be either a MAC Address or an IP address. It could be another type of network address.

The Defendants' construction is overly restrictive, vague, ambiguous, and confusing. First, the Defendants state that an address must be a "label."  What is a "label" and what significance does this term have?  There is nothing wrong with simply using the ordinary and understandable term "address."  Next, Defendants say the address must specify a "location." Again, what do they mean by this and why do they seek this construction?  A Visible World corporate designee on technical topics already admitted in deposition, on October 26, 2012, that a "network address" does not identify a geographic location.  It is thus unclear what Defendants

mean by "location."  Such a construction would confuse the jury and not aid its understanding.

*See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.").  Finally, Defendants seek to add the phrase "which can be used to route messages to that specific location."  Again, it is unclear what Defendants mean by this phrase, and specifically what Defendants mean by "route."  Do Defendants mean "direct messages" or something more limiting and technical?

The addition of a "route" conflicts with the patent specification because the patent discusses routing in contexts other than the use of a network address.  For example, the patent states: "Server 10 routes each commercial message to a respective channel."  (4:29-30).  Routing to a channel is not routing to a network address.  In another example, the patent discusses the contents of a "commercial routing database" and absent from that database are network addresses (3:63-4:3):

> Commercial routing database 33 keeps track of the routing requirements for commercial messages. It contains such information as how frequently each commercial message should be transmitted to each user or each group of users and the number of actual transmission of each message to each user or group of users. This database may also associate certain commercial messages with certain programming or certain viewing time slots.

Because the term "network address" is not in its ordinary meaning limited to "routing" and the patent does not limit "network addresses" to routing, and in fact, uses "routing" in a manner independent of network addresses, it would be improper and confusing to read a "routing" requirement into the simple term "network address."  Accordingly, the term should be construed to mean "an address specified by networking protocols."

###### 2.      Defendants' Answering Position

The term "network address" is properly construed to mean "a label representing a specific location on a network, which can be used to route messages to that specific location." The parties agree that this term requires construction.   Defendants' proposed construction accurately reflects what a "network address" is, as that term is used in the intrinsic record, including the claims, the specification, and the cited prior art, and in general usage in the field of the claimed invention.   Invidi's proposed construction, "an address specified by networking protocols," has no support in the intrinsic record, and is indefinite in that it requires reference to unspecified "networking protocols" to determine its actual scope.

As Invidi recognizes, "addressable data receivers, and their network addresses, predate the [claimed] invention." *Supra* p. 42.   Indeed, the patent explains that "the subscriber must have a converter 14 connected to the network 17.   Converter 14, as illustrated in FIG. 2, received information *addressed with the converter's network address* via a known addressable data receiver." *Id.*; '516 patent at 4:36-40.   As explained in detail with respect to the "selectively distributing…" term, messages can be routed to an addressable converter by addressing the message with the converter's network address.   For example, the specification explains that network addresses allow a local distribution center "to *communicate directly* with subscribers." '516 patent at 9:20-21.   In other words, the local distribution center supplies "the *appropriate routing information* for the actual subscribers in its region. . . ." *Id.* at 9:48-49.   Once the addressable receiver receives a commercial message that has been addressed to it using its network address, it "strip[s] off all *control* and *framing* information (including *routing information*). . . ." *Id.* at 4:45-49.   Indeed, again as explained above with respect to the "selectively distributing…" term, the entire purpose of identifying commercial messages with network addresses is to allow the commercial messages to be routed to individual subscribers.

44

Invidi's complaints that Defendants' construction is "confusing" are themselves confusing.  Invidi feigns perplexion: "Defendants say the address must specify a 'location.' Again, what do they mean by this and why do they seek this construction?  A Visible World corporate designee on technical topics already admitted in deposition . . . that a 'network address' does not identify a geographic location."  *Supra* p. 43.  The Visible World corporate designee was correct.  A network address does, however, identify a "location on a network," which is why that complete phrase is included in Defendants' construction.  Similarly, Invidi notes that the specification uses the term "route" in contexts other than routing messages, and so argues that Defendants' construction conflicts with the specification.  *Supra* pp. 43-44.  But that things other than commercial messages can be routed, does not mean that a network address, as used in the specification, is not a label identifying a location on the network, which can be used to route commercial messages to that location.  Defendants' construction accurately reflects the meaning of the term "network address" in the context of the patent and industry usage.

Invidi's proposed construction of "an address specified by networking protocols" ignores the teaching of the intrinsic evidence as to what a "network address" is actually used for in the context of the patent, and does not reflect anything found in the claims, specification, or prosecution history.  Moreover, it requires resort to extrinsic evidence (unspecified "networking protocols") to determine its actual meaning.  *See Power-One, Inc. v. Artesyn Techs. Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.").  Invidi claims that "[a]t the time of the invention, there were a variety of networking standards and each specified network addresses" such that the terms "network address" could mean a MAC address, IP address, or simply "another type of network address."

*See supra* p. 43.  Invidi seeks this construction, completely unmoored from the patent, because it wishes to allege that anything that might be called a "network address" in any context satisfies the requirements of the claims, regardless of whether it is or can actually be used to address an addressable converter.  Invidi's proposed construction should be rejected.

A "network address" as used in the patents is "a label representing a specific location on a network, which can be used to route messages to that specific location."  Defendants' construction should be adopted.

### 3.      Plaintiff's Reply Position

Defendants point to various portions of the specification, but nowhere does the specification state that a "network address" must be "a label representing a specific location on a network, which can be used to route messages to that specific location."  In fact, one of Defendants' citations actually associates "routing information" with "control and framing information" and not to a "network address."  The other citations do not mention labels, locations, or routing at all.

Defendants also once again assert that "the entire purpose of identifying commercial messages with network addresses is to allow the commercial messages to be routed to individual subscribers."  That is certainly not the "entire purpose" given that in the traditional cable network, commercial messages are placed on channels and information about which commercial to play is sent to the set top boxes.  (4:26-35).  To the extent that such an embodiment does not qualify as "routing" messages to individual subscribers, the Defendants are trying to read out one of the embodiments.  *See Katz Interactive Call Processing Litig. v. Am. Airlines, Inc.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) (there is a "strong presumption against a claim construction that excludes a disclosed embodiment").  Such a construction "is rarely, if ever, correct."  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 338 F.3d 858, 865 (Fed. Cir. 2004).

46

Also, Defendants fail to justify the inclusion of "location" or "routing." Defendants admit that a "location" is not a geographic location, but fail to explain what a "location" is in this context. If Defendants cannot explain their own construction, it certainly would not help the jury. As for "routing," the "routing" database does not contain network addresses. (3:63-4:3) The "routing" of commercials to channels does not involve network addresses. The patent does not tie "routing" to a "network address."

Finally, Defendants complain that Invidi's construction requires extrinsic evidence. Defendants' confuse infringement with claim construction.[29] A "network address" is an address specified by networking protocols. That is what distinguishes a "network address" from other types of addresses. For example, a "postal address" would be an address specified by postal systems. It is not necessary to specify every conceivable networking protocol to make the claim term definite. *See, e.g.*, *Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382 (Fed. Cir. 1999) (construing the term "frame" to be limited to "a character-based protocol" without specifying all possible protocols). The construction "address specified by networking protocols" is the plain meaning of "address" as modified by "network." And this meaning is definite.

For support, Defendants cite to *Power-One, Inc. v. Artesyn Tech., Inc.*, 599 F.3d 1343 (Fed. Cir. 2010) where the defendant argued that the plaintiff's proposed construction was flawed because it did not delineate the scope of the term "POL regulator" in "any meaningfully precise manner." The Court rejected this argument, saying that "the environment dictates the

---

[29] To prove infringement, Invidi will compare this claim construction to the accused product and prove that the address the accused product uses is an address specified by a networking protocol. In fact, the Defendants use a MAC Address which is unquestionably an address specified by networking protocols, and so the presence of this limitation will not be in genuine dispute.

necessary preciseness of the terms." *Id.* at 1348.  Here, the term "networking protocols" is

sufficiently precise and there is no need to list them all.

### 4.     Defendants' Sur-Reply Position

The term "network address" is properly construed to mean "a label representing a

specific location on a network, which can be used to route messages to that specific location."

This construction is driven by the use and function of the "network address" as described in the

specification and embodied in the claims.[30]

Invidi does not rebut Defendants' contention that network addresses are used for

communicating directly with set top boxes and to route messages to set top boxes.  Invidi

complains that "one of Defendants' citations actually associates 'routing information' with

'control and framing information' and not to a 'network address.'"  *Supra* pp. 46-47.  Invidi's

point is unclear, but control and framing information is the information the network needs to

deliver user data, and includes network address information.  *See*, *e.g.*,

http://en.wikipedia.org/wiki/Network_packet (accessed Jan. 2, 2013).

Invidi's only other new argument relates to a "traditional cable network" embodiment in

which commercials are broadcast to all subscribers.  *Supra* p. 47.  The term "network address" is

included in the claims to allow messages to be routed to a subscriber, and Defendants have

addressed this in the "selectively distributing" section above.

Invidi's proposed construction is indefinite.  While it is not necessary to specify every

conceivable embodiment in a construction, it is necessary to make the claim term definite and

understandable to the jury.  *See Hitachi Cons. Elecs. Co. v. Top Victory Elecs. Co.*, No. 2:10-cv-

260, 2012 WL 5494087, at *13 (E.D. Tex. Nov. 13, 2012) (declining to tie construction of term

---

[30] Location refers to a location on a network.  A network is an interconnected system consisting
of nodes and links.  One must know the location of a node on the network to know what links to
use to route information to that node.

"broadcast system standard" to publicly available standards, because "extrinsic evidence

regarding only the constituent term 'standard' is disfavored as 'focus[ing] the inquiry on the

abstract meaning of words rather than on the meaning of claim terms within the context of the

patent.'").  Invidi's citation to *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382

(Fed. Cir. 1999) is inapposite.  The construction in *Wang* did not require reference to an extrinsic

document to determine the bounds of the term, as Invidi proposes in this case, but actually

described the term based on the specification.  *Id.*  Moreover, Invidi's construction of "an

address specified by networking protocols" finds no support in, and is completely divorced from,

the specification.  *See supra* pp. 45-46.

### D.  "A reservoir of data"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "a reservoir of data" | Collection of data | A database or other organized collection of data |

### 1.  Plaintiff's Opening Position

Here is another term that does not require construction.  Nonetheless, should the Court

wish to provide the jury with guidance as to what a "reservoir of data" is, it is simply a

"collection" of data.

The term "reservoir" is very broad.  It is a holder of something.  Nonetheless, the

Defendants seek to read in the terms "database" and "organized" collection of data.  The claim

does not use the term "database" and therefore it would be improper to read "database" into the

claims.  Nothing in the term "reservoir" connotes "database."  *See i4i Ltd. P'ship v. Microsoft

Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("Had the inventors intended this limitation, they

could have drafted the claims to expressly include it.").  Nor should the Court read in the term

"organized."   The meaning of this term is unclear.   What is an "organized" collection of data as opposed to any other collection of data?   Such a construction would inject unnecessary ambiguity.   Moreover, the term "organized" is not even found in the patent.   Thus, the source of this alleged limitation is far from clear.   Accordingly, should any construction be necessary, the term "reservoir of data" should be construed as "collection of data."

## 2.   Defendant's Answering Position

The term "a reservoir of data" is properly construed to mean "a database or other organized collection of data."   Invidi argues that this term does not require construction, but "reservoir" in this context is confusing and ambiguous, and so should be construed.   *Cf. Apple Inc. and NeXT Software Inc. v. Motorola, Inc.*, Case No. 1:11-cv-08540 (N.D. Ill. March 10, 2012) (Posner, J.) ("There is no point in giving jurors stuff they won't understand. The jury [ ] will not consists of patent lawyers and computer scientists or engineers…").   Moreover, "the parties present a fundamental dispute regarding the scope of a claim term," and so the court must resolve it.   *O2 Micro*, 521 F.3d at 1362-63; *Medicis Pharm. Corp.*, 2012 WL 2126873 at *5. Defendants' proposed construction is consistent with the patent, because the only "holder" (*Supra* p. 50) of data in the patent "containing network addresses of the subscriber terminals and subscriber profile data associated with each of the subscriber households and including demographic data" is a database.   Invidi's proposed construction is overbroad.

The only structure described in the patent as containing network addresses and subscriber profile data including demographic data is a database.   '516 patent at fig.3 ("Household Profile Database"), 2:6-11 ("The addresses are selected by the server based on information stored in a database related to demographic and other information relating to the household of the subscriber"), 3:41-56 ("a household database (described in more detail below) containing statistical information related to individual subscriber households"), 4:66-5:1 ("profile household

50

data stored in profile database 36"). A database is an organized collection of data. "Because this construction is driven by the use of [the term] in the context of the claim and is supported by the written description, a broader construction that lacks support in the intrinsic record must yield." *Pause Tech.,* 419 F.3d at 1333.

Invidi complains that the term "organized" is not found in the patent. *Supra* p. 50. But the term "reservoir" is also not found anywhere in the specification, nor is the term "collection." The only term that is used, and used repeatedly, is "database."

Invidi seeks to have the ambiguous "reservoir of data" either not construed, or construed merely as "collection of data" because Invidi alleges that varied and unconnected sources of data together satisfy the requirement of a "reservoir of data." Such a construction, however, would defeat the purpose of the claimed invention. Network addresses of subscriber terminals and subscriber profile data must be part of a database or other organized collection of data in order to allow the claimed invention to "select[] at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least one subscriber terminal" and then "identify[] the selected at least one commercial message with the network address of said at least one subscriber terminal." '516 patent at 10:1-13.

"[A] reservoir of data" means "a database or other organized collection of data." Defendants' construction should be adopted.

### 3.      Plaintiff's Reply Position

A "reservoir of data" is a broad term. Defendants improperly seek to limit it to a database. The patentee did not use the term "database" in the claim, and the extensive use of the term "database" in the specification demonstrates that the patentee knew how to use this term when it was intended. Despite the option to use "database," the patentee chose to use "reservoir

51

of data," a broader term that means a "collection of data."  Defendants' attempt to rewrite the

claim so that a "reservoir" is a single database is also wrong.  In fact, the "reservoir of data" in

the preferred (but not exclusive) embodiment contains multiple databases and libraries.  The

Figure below illustrates that the "reservoir" is not limited to a single database (various

"reservoir" parts within the red boundary):



Nor must a reservoir even have a single database.  Accordingly, a "reservoir" is a general

and broad description of a "collection of data."

### 4.    Defendants' Sur-Reply Position

"A reservoir of data" means "a database or other organized collection of data."  Without

further explanation, Invidi argues that everything within Invidi's red box is part of a single

"reservoir of data."  *Supra* pp. 52-53.  The patent never describes the elements outlined by Invidi

as a single reservoir of data.  Invidi seeks to argue that all that is required for a "reservoir of

data" is that the various pieces of data exist in some form somewhere, even if completely

unorganized and unconnected.  Nothing in the patent supports Invidi's overbroad construction.

### E.      "Subscriber profile data"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "subscriber profile data" | Data indicative of subscriber characteristics | Set of characteristics specific to a subscriber in a range of categories |

### 1.      Plaintiff's Opening Position

For "subscriber profile data," the parties appear to agree that the data is indicative of subscriber characteristics.  For example, the patent gives an example of profile data that is a "rating" corresponding to the likelihood that a particular subscriber may purchase a luxury automobile.  (5:18-34).  Each subscriber would have a profile with that subscriber's unique rating.  The rating is derived from a number of characteristics, including age, gender, income, length of residence, number of automobiles, etc.

Typically, a subscriber would have many such ratings (one for each type of advertisement), however, nothing in the words "subscriber profile data" requires more than one rating.  Thus, Defendants' construction, which seeks to heap on additional requirements, must be rejected.  For example, the Defendants say the profile data must be "a set of" characteristics.  Nothing in the phrase "subscriber profile data" requires a "set"—if by "set" Defendants mean to imply two or more.  A subscriber profile may be a single rating.  If Defendants' construction would rule out that possibility, it cannot be correct.  Likewise, the Defendants' requirement that profile data correspond to a "range of categories" is overly restrictive if a "range" must be more than one.  Again, a single rating for the category "likely to buy luxury automobiles" is subscriber profile data.  Two categories are not required by the claims.  Nor does the specification ever suggest that profile data requires a minimum of two characteristics.

Accordingly, the proper construction of subscriber profile data is "data indicative of subscriber characteristics."   By this construction, Invidi means to include a single characteristic, and therefore proposes, as an alternative, "data indicative of at least one subscriber characteristic" if the Court believes the alternative would be more helpful to the jury.

### 2.    Defendants' Answering Position

The term "subscriber profile data" is properly construed to mean "set of characteristics specific to a subscriber in a range of categories."   Contrary to Invidi's suggestion (*Supra* p. 53), the parties do not "agree that the data is [merely] indicative of subscriber characteristics." Defendants' construction requires that the data is actual "characteristics specific to a subscriber" while Invidi's construction includes data "indicative" of characteristics of a subscriber, such as "rating data" that is derived from the actual characteristics.   Defendants' construction is driven by the specification and the claims.   Invidi, in contrast, ignores the clear intrinsic evidence in favor of an overbroad construction that is contrary to the specification.

The specification states that it is an object of the invention to "distribute commercial programming to particular subscribers based on ***predetermined characteristics***."   '516 patent at 1:59-61.   It describes "a household database . . . containing statistical information related to individual subscriber households."   *Id.* at 3:43-45.   "[C]ommercial messages are selected by CMMS 11 based on profile household data stored in profile database 36."   *Id.* at 4:66-5:1. Although the specification does not directly describe the "subscriber profile data" contained in the "household database," it does describe that "statistical profiles" of "customer households" and "all households" are compiled from similar information:   "Using demographic, census and survey data, and other available data, information about these households in a ***wide range of categories*** is gathered (step 2).   This information is compiled into a statistical profile of customer households (step 3).   Also, the same data is gathered with respect to all households (step 4) and a

statistical profile of all households is created (step 5)." *Id.* at 5:7-18. The two statistical profiles are compared to generate a ranking formula that takes the form of a sum of weighted categories. *Id.* at 5:19-26.

The subscriber profile data consists of the "value[s] inserted for a variable" in such a formula in order to generate such a ranking. *Id.* at 5:32-48. This is clear because the entire process is described as "the preferred method utilized in CMMS 11 for determining the commercials to be sent to a subscriber" (*id.* at 5:1-3), *i.e.*, the preferred method for "selecting at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least one subscriber terminal" (*id.* at 10:5-9). The "CMMS 11" does not "Evaluate Each Subscriber Household as A Target" (*id.* fig.4 (step 9)) "based on" a ranking, because a ranking is the output of that evaluation, not an input. It evaluates each subscriber household using a set of characteristics specific to a subscriber in the required categories. Accordingly, the "subscriber profile data" is the "set of characteristics specific to a subscriber in a range of categories."

Invidi ignores the clear teaching of the specification, which devotes significant space to describing this process of "selecting at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least on subscriber terminal" by performing a "statistical analysis." *Id.* at 5:1-8:64. Instead, Invidi argues that a single "rating," a result of that process, constitutes "subscriber profile data." *Supra* pp. 53-54. Invidi provides no support for such a construction and that reading lacks any support in the specification. Thus, because Defendants' proposed construction is "driven by the use of [the term] in the context of the claim and is supported by the written description, a broader

construction that lacks support in the intrinsic record must yield." *Pause Tech.*, 419 F.3d at 1333.

"Subscriber profile data" means "set of characteristics specific to a subscriber in a range of categories," and Defendants' construction should be adopted.

### 3.    Plaintiff's Reply Position

The parties agree that "subscriber profile data" is data that relates to subscriber characteristics. Defendants, however, seek to read in additional requirements that are not required by the general term "subscriber profile data." For example, the Defendants seek to limit the patent to profile data containing a "range of categories." There is no basis for this limitation. Why would profile data limited to a single category (e.g. income) fall outside the patent claim? In fact, one example in the '516 patent develops a single category profile: "luxury automobiles." Each household has a rating generated that represents its likelihood to purchase a luxury automobile. (5:25-30). The rating in the example is based on multiple factors, but the end result is one aggregated rating. The patent disclosure clearly includes single characteristic profiles.

Defendants assert that this household rating is not "subscriber profile data," but fail to articulate why not. The rating is developed for each household and clearly characterizes that household. Defendants also focus on the fact that the exemplary "rating" is the result of step 9 of Figure 4. Invidi agrees. The end result of step 9 is subscriber profile data. The system then uses that profile data to associate specific households with commercial messages. (8:57-64).

The Defendants confuse the "Evaluate Each Subscriber Household As A Target" step with the claimed selecting steps. They are not the same. "Selecting" commercial messages and "evaluating" households are distinct activities in the '516 patent. Figure 4 in the '516 patent shows one possible algorithm for the "evaluating" step. Non-asserted dependent limitations (*e.g.* "generating said target household profile") use this algorithm, precluding the possibility that it is

56

a "selecting" algorithm. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest"). In sum, Defendants reasoning for its narrowing construction of this term is flawed. The proper construction is "data indicative of subscriber characteristics."

### 4.    Defendants' Sur-Reply Position

The term "subscriber profile data" means "set of characteristics specific to a subscriber in a range of categories."  Invidi largely ignores Defendants' Answering Brief and instead merely repeats its unsupported argument that a single "rating" that "characterizes [a] household" constitutes subscriber profile data.  Defendants have not confused any steps, and Invidi's argument that the "rating" in the specification is subscriber profile data is unsupported by the non-asserted dependent claim (claim 11) that Invidi identifies.  Claim 10, from which claim 11 depends, makes clear that "commercials for transmission" are selected "in relationship to the comparison between [the] subscriber profile data and the [target] household profile data" generated by the method in claim 11.  '516 patent at 12:8-16.  In other words, in the dependent claim that Invidi points to, subscriber profile data is the actual information regarding each subscriber that is then compared to a target household profile and other factors in order to generate a rating and then select which commercial message to transmit.  The rating generated by this comparison therefore cannot be subscriber profile data.  *See supra* pp. 55-56.

Invidi also argues that profile data can be limited to one category but disregards the clear language of the patent that information about households from "a wide range of categories" is gathered and analyzed.  '516 patent at 5:1-6:19.

F.        "Demographic data"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "demographic data" | No construction necessary/ alternatively, data related to characteristics shared by a section of a population, such as age, gender, car ownership, etc. | Data expressing vital or social human characteristics, such as age, gender, income level, race, and ethnicity |

1.        Plaintiff's Opening Position

This is another term that does not require construction.  If the term is construed, it should be given its ordinary broad meaning.  For example, the patent states in the "Background of the Invention" section that "[t]he broadcast and advertising industries have historically focused on the ability of programming to predictably deliver a mass audience of people defined by **broad demographics (e.g. women 35-49 with above average income, men 18-34)** . . . ." (1:15-19). Various standard demographic categories are listed in TABLE I of the patent, but, of course, this is not an exhaustive list.  (5:50-63).  The parties seem close, but Invidi believes its construction offers more clarity than Defendants' construction.  For example, what exactly is a "vital" or "social" characteristic?  Invidi asked the Defendants to stipulate to Invidi's construction, but the Defendants declined.  However, Invidi does not understand what the Defendants wish to exclude through the use of the terms "vital" and "social."  Perhaps the Defendants will provide more clarity in their response.  Specifically, if the Defendants believe that any category found in TABLE I of the patent is not a "demographic" category, the Defendants should identify those categories and explain why the word "demographic" excludes that category.

Accordingly, should the term "demographic data" be construed, Invidi contends it should be construed to mean "data related to characteristics shared by a section of a population, such as age, gender, car ownership, etc."

58

### 2.      Defendants' Answering Position

The term "demographic data" is properly construed to mean "data expressing vital or social human characteristics, such as age, gender, income level, race, and ethnicity." Defendants' construction accurately reflects the ordinary and customary meaning of "demographic data" as well as how it is used in the patent.  Invidi argues that either no construction is required or proposes a construction that renders the term "demographic data" superfluous.

Defendants' construction gives meaning to the term "demographic data" and limits it to its proper scope.  By its proposed construction, Invidi indicates that it intends to argue to the jury that the term "demographic data" is not limiting.  As discussed above, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro*, 521 F.3d at 1362-63; *Medicis Pharm. Corp.*, 2012 WL 2126873 at *5. Accordingly, the term requires construction.

Invidi argues that "demographic data" includes any "data related to characteristics shared by a population." *Supra* p. 59.  But any characteristic can be "shared by a population" and Invidi demonstrates that by including "car ownership" as demographic data.  *Id.*  Invidi argues that "[v]arious standard demographic categories are listed in TABLE I of the patent" (*Supra* p. 58), but "Table I [merely] defines what category of information each index variable A through K represents" in the exemplary equation included in the patent ('516 patent at 5:34-36).  Nowhere does the specification describe the categories in Table I as demographic data, as opposed to "other available data." *See id.* at 5:12-14.  The term "including demographic data" must be read to mean something more than "subscriber profile data" on its own for the claim to be internally coherent and not redundant.  *See Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006); *see also Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343,

1348 (Fed. Cir. 2010).  "While not an absolute rule, all claim terms are presumed to have meaning in a claim."  *Innova/Pure Water, Inc.* v. *Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).  "In the absence of any evidence to the contrary, [the court] must presume that the use of these different terms in the claims connotes different meanings."  *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).  Invidi's proposed construction strips demographic data of any meaning, making the term "entirely superfluous."  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).  Accordingly, Invidi's proposed construction should be rejected.

Demographic data is "data expressing vital or social human characteristics" and the standard demographic categories are "age, gender, income level, race, and ethnicity" as reflected in Defendants' construction.  This is consistent with the ordinary meaning of "demographic data" and its usage in the specification.  *See* '516 patent at 1:16-20 ("broad demographics (e.g. women 35-49 with above average income, men 1-34)"); *see also id.* at [57], 2:6-11, 3:41-45, 5:7-18.  Construing "demographic data" to mean "data expressing vital or social human characteristics, such as age, gender, income level, race, and ethnicity" avoids the redundancy and coherency problems that Invidi's construction would create.

The term "demographic data" means "data expressing vital or social human characteristics, such as age, gender, income level, race, and ethnicity."  Defendants' construction should be adopted.

### 3.     Plaintiff's Reply Position

The parties' constructions are close, but Invidi's proposal is easily understood.   Invidi does not understand the difference between "characteristics shared by a section of the population" and "social human characteristics" (the term used by Defendants) and is unsure what a "vital" human characteristic is (another term used by Defendants).

Moreover, in its opening brief, Invidi requested that Defendants defend their attack on Table I of the '516 patent: "Specifically, if the Defendants believe that any category found in TABLE I of the patent is not a 'demographic' category, the Defendants should identify those categories and explain why the word "demographic" excludes that category." (*See supra* 59). The Defendants declined to do so.

Defendants argue that "subscriber profile data" must mean something different than "demographic data." But Invidi is not arguing that "subscriber profile data" and "demographic data" have the same construction. Specifically, "subscriber profile data" includes "demographic data." But the profile data may also include non-demographic data, such as subscriber name, postal address, or other subscriber information.

Regardless, Defendants' construction would confuse the jury and therefore should be rejected. Lay people know the definition of demographic data without assistance.

### 4.     Defendants' Sur-Reply Position

"Demographic data" means "data expressing vital or social human characteristics, such as age, gender, income level, race, and ethnicity." Invidi's only response to Defendants' arguments is to claim it is "not arguing that 'subscriber profile data' and 'demographic data' have the same construction." But the only subscriber profile data that Invidi explicitly identifies as "non-demographic" data is "profile data" that is unique to a subscriber, "such as subscriber name [and] postal address." *Supra* p. 61. Such unique data falls outside the definition of "subscriber characteristics" that is required by either party's constructions of "subscriber profile data." In any case, Invidi's broad construction would still strip the term demographic data of any meaning.

61

### G.       "Operatively associated with"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| "operatively associated with" | Operates in conjunction with | In electronic communication to accomplish the recited function |

### 1.       Plaintiff's Opening Position

The term "operatively associated with" is only found in claim 1 of the patent.  That specific phrase is not found in the specification.  It is a phrase that explains the structural relationship between the "selection means" and the reservoir of data and the "identifying means" and the reservoir of data.   The claim language is broad.  That structural relationship is one of general association.  The selection means and identifying means operate in conjunction with the reservoir of data and use information from that reservoir of data.

Defendants seek to add the requirement of "electronic communication."  There is no basis to read "electronic communication" into the broad term "operatively associated."  Or more accurately, there is no reason to substitute "operatively associate with" with the phrase "in electronic communication with."  Had the patentee wished to require electronic communication, the patentee would have specified "electronic communication."  *See, e.g., Black Diamond CCT Holdings, LLC v. Coupons, Inc.,* 2003 WL 25783115,*8 (D. Md., December 17, 2003) ("'Operatively associated with the central data repository' shall be construed to mean that the server operates in conjunction with the central data repository.").

### 2.       Defendants' Answering Position

The term "operatively associated with" is properly construed to mean "in electronic communication to accomplish the recited function."  Contrary to Invidi's contention (*Supra* p. 62), the structural relationship implied by "operatively associated with" is not one of general association.

Invidi's construction is inappropriate because it "largely reads the term 'operatively' out of the phrase 'operatively connected.'" *Innova/Pure Water*, 381 F.3d at 1119. "Operatively" modifies "associated" to require the association accomplish the "intended function or operation of the claimed structure," *i.e.*, "selecting…" or "identifying…" depending on the claim requirement. *See id.* It doesn't simply mean "operates." "In electronic communication" accurately reflects how these computing devices are connected to accomplish the recited function and is consistent with the specification. *See* '516 patent at 1:67-2:11, 3:41-51, 4:66-5:1. The case cited by Invidi is inapposite, because it provides no justification for construing "operatively associated with" as "operates in conjunction with." Indeed, the issue in that case appears to have been the construction of the "at least one server" portion of the longer term at issue rather than "operatively associated." *See Black Diamond CCT Holdings, LLC v. Coupons, Inc.*, 2003 WL 25783115, at *8 (D. Md. December 17, 2003).

"Operatively associated with" as used in the patent means "in electronic communication to accomplish the recited function." Defendants' construction should be adopted.

### 3.      Plaintiff's Reply Position

The term "operatively associated with" means "operates in conjunction with." Even though Invidi specifically includes the term "operates" in its construction to give meaning and effect to the "operatively" term, Defendants accuse Invidi of reading out the term "operatively" from the claim. They cite *Innova/Pure Water*, 381 F.3d at 1119 for support, but in that case, the defendants sought a narrow construction of "operatively connected" to require physical tenacious attachment. The Federal Circuit disagreed, holding that the term was broad and only required a connection capable of providing the function of filtering (which was the admitted purpose of the connection). *Id.* Nothing in Innova/Pure Water permits adding a structural limitation absent from the claims such as "in electronic communication."

63

### 4.    Defendants' Sur-Reply Position

The term "operatively associated with" is properly construed to mean "in electronic communication to accomplish the recited function."  "Operatively" modifies "associated with" (that is, it describes how the elements must be associated) and cannot simply be replaced by the verb "operates."  *Supra* p. 63.   As in *Innova/Pure Water*, 381 F.3d at 1119, Invidi is attempting to read out the ordinary meaning of "operatively."

### H.    "Identifying . . .terminal"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "identifying the selected at least one commercial message with the network address of said at least one subscriber terminal" | The entire phrase should not be construed.<br><br>Only the words "identifying . . . with" should be construed, and the construction for "identifying . . . with" is "associating . . . with" | Embedding the network address of said at least one subscriber terminal in the selected at least one commercial message |

### 1.    Plaintiff's Opening Position

The entire phrase "identifying the selected at least one commercial message with the network address of said at least one subscriber terminal" does **not** need to be construed.  Most of the words are clear on their face.  The Defendants' proposal to wholesale substitute one long phrase with another is simply an attempt to rewrite the patent claim.  Construction is about interpreting specific **terms** within a claim that need clarification.  *See United States Surgical Corp.,* 103 F.3d at 1568; *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").  Claim construction is not invitation to redraft the claims.

Here, Defendants propose swapping the 19 words found in the claim with 19 new words.  It is as though the Defendants don't like the hand that has been dealt and are throwing their 19

64

cards on the table and asking to be dealt 19 new cards.  However, the Defendants cannot redraft the claims of Invidi's patent.  The 19 words they wish were in the claim are not there.

Turning to the actual claim phrase, the only term that might require construction is the term "identifying."  The claim states that one thing is to be identified with something else.  In this context, it is clear that the "identifying" is an association—"identifying . . . with" means "associating . . . with."  Once this substitution is made, the phrase is undeniably clear and understandable:

"[Associating] the selected at least one commercial message with the network address of said at least one subscriber terminal."  No further clarification or construction is necessary.

The Defendants' construction strains the simple word "identifying . . . with" beyond its breaking point.  There is nothing in the claim language suggesting that the network address must be "embedded . . . in" the commercial message.

The patent specification does discuss a "smart commercial" in one embodiment of the invention.  The "smart commercial" contains "embedded" information:  "Each commercial message is a 'smart commercial', in that it contains embedded information identifying the categories of recipients for the message."  Accordingly, the patentee knew how to specify "embedded" information when it wanted to.  In this circumstance, the patentee chose broader terms than "embedded" information.  Having made this conscious choice, it would be improper for the Court to now limit the claims in a manner both inconsistent with the claim language itself and the clear intent of the patentee.

Moreover, the prosecution history supports Invidi's broad construction and conclusively demonstrates that the Defendants are wrong.  The original claim called for a "tagging means" which would have arguably limited the claim to the "smart commercial" embodiment.  The

patentee expressly stated that the claim was broader than that, and therefore amended the claim

to replace the limited term "tagging" with the broader term "identifying:"

> It is also noted that the "tagging means" of Claim 1 is
> now specified as "identifying means."  It is believed that this
> amendment is appropriate and proper since the function of this
> means is "identifying" and is not limited to tagging in order to
> do so.  Similarly, "tagging" has been changed to "identifying" in
> Claim 5, Line 5, and "tagged" has been changed to "identified" in
> Claim 5, Line 17.  It is contemplated that the identification
> with a product code set forth in this claim can be performed in
> other ways than tagging, and tagging is therefore believed to be
> too limited a definition of that method step.

(JA-42).

The term "identifying" was specifically distinguished as broader than "tagging" (which is akin to

"embedding").  Finally, the American Heritage Dictionary defines "identify . . . with" as "to

associate or affiliate closely with." (http://www.ahdictionary.com/word/search.html?q=identify,

3rd definition of "identify").   Accordingly, the term "identifying . . . with" should be interpreted

in its ordinary broad sense, which is "associating . . .  with."

### 2.    Defendants' Answering Position

The term "identifying the selected at least one commercial message with the network

address of said at least one subscriber terminal" is properly construed to mean "embedding the

network address of said at least one subscriber terminal in the selected at least one commercial

message."   Defendants' construction is consistent with the language of the claim and the

disclosure of the specification.   At best, Invidi's construction does nothing except to replace a

word that Invidi acknowledges means "to associate . . . closely with" with simply "associating,"

improperly broadening the language of the claim.  *See supra* pp. 66-67.

66

Invidi's primary complaint seems to be that Defendants' construction is "simply an attempt to rewrite the patent claim," because "Defendants propose swapping the 19 words found in the claim with 19 new words." *Supra* p. 65. Invidi says ,"[i]t is as though the Defendants don't like the hand that has been dealt and are throwing their 19 cards on the table and asking to be dealt 19 new cards. . . . The 19 words they wish were in the claim are not there." *Id.* Invidi's claims are overblown and inaccurate. Defendants' proposed construction includes 17 words found in the claim itself ("the selected at least one commercial message" and "the network address of said at least one subscriber terminal") though their order is swapped, and as with Invidi's proposed construction, only construes the words "identifying . . . with."

As explained in detail with respect to the "selectively distributing…" term, the specification describes selectively distributing messages by addressing messages to subscriber terminals. The specification consistently describes "identifying . . . commercial message[s] with" some piece of information as involving the embedding of that piece of information. For example, the specification says "[c]ommercial messages to be distributed over the network contain *embedded information identifying categories* of recipients for each message." '516 patent at 2:65-68. "*Each commercial message* is a 'smart commercial', in that it *contains embedded information identifying* the categories of recipients for the message." *Id.* at 3:21-24. "[C]ommercial message schedule 31 determines which messages will be sent to each household, and server 10 will do so by *embedding routing information* from database 34 in its bit stream. Thus, *each commercial message will have appropriate routing information associated with it*." *Id.* at 3:57-62.

Invidi argues that embedding information is limited to a single embodiment of the invention and so it would be inappropriate to limit the claim to that embodiment. *Supra* p. 66.

67

But it is unclear how Invidi believes commercial messages can be identified with network addresses other than by embedding the network addresses in the commercial messages, because the patent never describes any other way to identify information with commercial messages.  *Cf. Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998) (finding claims invalid for lack of written description, because "claims may be no broader than the supporting disclosure, and therefore . . .  a narrow disclosure will limit claim breadth").  If a construction is "driven by the use of [the term] in the context of the claim and is supported by the written description," as Defendants' construction is, "a broader construction that lacks support in the intrinsic record must yield."  *Pause Tech.*, 419 F.3d at 1333.

Invidi also argues that the claim must be broader because the patentee amended "tagging" in the originally filed claims to read "identifying."  *Supra* p. 66.  The original claim language is intrinsic evidence of what is meant by "identifying," and "embedding," rather than necessarily being synonymous with "tagging," is broader than "tagging."  Thus, to be consistent with the intrinsic record, "identifying the selected at least one commercial message with the network address of said at least one subscriber terminal" should be construed to mean "embedding the network address of said at least one subscriber terminal in the selected at least one commercial message."

"Identifying the selected at least one commercial message with the network address of said at least one subscriber terminal" means "embedding the network address of said at least one subscriber terminal in the selected at least one commercial message."  Defendants' construction should be adopted.

68

### 3.      Plaintiff's Reply Position

The Defendants appear to concede that the only terms requiring construction are "identifying . . . with" and that the entire phrase need not be wholesale replaced: "[A]as with Invidi's proposed construction, [Defendants' construction] only construes the words 'identifying . . . with.'" (*See supra*. at 67).  The Defendants nonetheless press for their original construction.  The best approach is to only construe those terms actually requiring construction.  Here, that term is "identifying . . .with," and it should be construed to mean "associating . . . with."

The claim term "identifying" is clearly broader than "embedding."  In fact, this claim term was broadened during prosecution.  During prosecution, the patentee originally used the word "tagging," and purposely replaced the term with "identifying" **to broaden the claims**.

The Defendants do not contend that the ordinary meaning of "identifying" to one of skill in the art is "embedding."  Instead, Defendants argue (incorrectly) that the patent "consistently" discloses "embedding" network addresses in smart commercials. For support, Defendants point to nothing.  Indeed, there is no text in the specification to back up this assertion.  In fact, the references to "embedding" in the patent all relate to embedding "category" information. (3:20-24).  Nowhere are network addresses embedded.

The patent states that a set of addresses is produced "corresponding to each category of recipient identified by the embedded information."  (3:25-28)  Thus, in this embodiment, category information is embedded, but network addresses are not.  Instead, a set of network addresses is separately recorded.  Accordingly, there is no basis to read in "embedding" into the broad term "identifying . . . with."

### 4.    Defendants' Sur-Reply Position

The "identifying . . ." term means "embedding the network address of said at least one subscriber terminal in the selected at least one commercial message."  Invidi's argument that the specification does not disclose embedding network addresses in commercial messages (*Supra* pp. 69-70 is wrong.  As is unrebutted by Invidi, "[t]he specification consistently describes 'identifying . . . commercial message[s] with' some piece of information as involving embedding that piece of information."  *Supra* pp. 67-68.  On the one occasion the specification explicitly discusses identifying a commercial message with a network address, it states that a server "selectively ***tags commercial messages*** with the ***converter addresses*** of subscribers, satisfying the identifying categories." '516 patent at 2:1-3.  Tagging is a form of embedding.

### I.    "Selection means"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "selection means" | CMMS 11 | A general purpose computer programmed with the algorithm disclosed in Figure 4 of the '516 patent |

### 1.    Plaintiff's Opening Position

The parties agree that the "selection means" is a means-plus-function term.  Accordingly, the term covers the corresponding structure in the specification and equivalent structures.  For means-plus-function terms, the role of the Court is to identify the structures in the specification. *Medical Instrumentation and Diagnostics Corp. v. Elekta* AB, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The structure associated with the claimed "selection means . . . for selecting at least one of the commercial messages for transmission to at least one of the subscriber terminals based on the subscriber profile data associated with said at least one subscriber terminal" is CMMS 11, which is the "Commercial Message Management Server." (3:24-28).  The patent specifically

70

says that "the CMMS 11 will select certain households or groups of households to receive certain commercial messages . . . ."  (3:48-40).

Notwithstanding this clear disclosure, the Defendants point to the algorithm of Figure 4 of the '516 patent.  The claimed "selection means" relates to commercial messages.  However, Figure 4 does not mention commercial messages.  The Defendants' identification appears to be in error.

## 2.    Defendants' Answering Position

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. "To avoid purely functional claiming in cases involving computer-implemented inventions," the Federal Circuit consistently requires "'that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.'"  *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) (quoting *Aristocrat Techs. Austl. Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  If special programming is required, the patent must disclose an algorithm in understandable terms including but not limited to diagrams, prose, or flow charts. *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012).  Then, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs.*, 521 F.3d at 1333.

Here, the "CMMS 11" is a general purpose computer that requires special programming. Although Invidi argues that "Figure 4 does not mention commercial messages," the specification is clear that "FIG. 4 is a flow diagram illustrating the preferred method utilized in CMMS 11 for determining the commercials to be sent to a subscriber." '516 patent at 5:1-3.  Indeed, the

71

algorithm disclosed in Figure 4 is the only method described by which the CMMS 11 determines, or selects, the commercials to be sent to a subscriber. Accordingly, the structure corresponding to the "selection means" is "a general purpose computer programmed with the algorithm disclosed in Figure 4 of the '516 patent."

Invidi argues that the "CMMS 11" is the structure associated with the "selection means" (*Supra* p. 71), but it is unclear what Invidi's proposed construction means for the scope of the claim.  In other words, Invidi argues for a construction of "selection means" that would make the claim impermissibly indefinite and ultimately attempt to "capture any possible means." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009).  For example, in *Blackboard*, the Federal Circuit found a similar paragraph description of "Access control manager 151" [31]  to be lacking definiteness because it failed to "disclose the particular structure that is used to perform the recited function." *Id.*  Like the description in *Blackboard*, the description of CMMS 11 on its own would not rise to the level of detail required by the Federal Circuit for algorithm disclosures in means-plus-function claims.

Because the only definite structure corresponding to the "selection means" in the patent is "a general purpose computer programmed with the algorithm disclosed in Figure 4 of the '516 patent," Defendant's construction should be adopted.

### 3.    Plaintiff's Reply Position

Invidi identified CMMS 11, which is the "Commercial Message Management Server," (3:24-28) as the corresponding structure.  The general selection algorithm of the CMMS 11 is

---

[31]      "Access control manager 151 creates an access control list (ACL) for one or more subsystems in response to a request from a subsystem to have its resources protected through adherence to an ACL. Education support system 100 provides multiple levels of access restrictions to enable different types of users to effectively interact with the system (e.g. access web pages, upload or download files, view grade information) while preserving confidentiality of information." *Blackboard*, 574 F.3d at 1382.

discussed in column 3, lines 28-63. There is no obligation that the algorithm be provided in a

flow chart.  Defendants point to Figure 4, but that figure is a profile creation algorithm

referenced in non-asserted dependent claims.  It is not a commercial selection algorithm.



(JA-50).

(JA-50).

### 4.     Defendants' Sur-Reply Position

The structure corresponding to the "selection means" in the patent is "a general purpose computer programmed with the algorithm disclosed in Figure 4 of the '516 patent." The specification must describe the algorithm in "understandable terms." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). Figure 4 and the accompanying text in columns 5-8 is "the preferred" and only described "method utilized in CMMS 11 for determining the commercials to be sent to a subscriber." *Supra* pp. 72-73. Invidi's argument that Figure 4 is "not a commercial selection algorithm" is wrong as discussed above with respect to "subscriber profile data." ███████████  ████████████████████████  Such extrinsic evidence, especially when it was created in an entirely different context, has no value in claim construction. *Cf. SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005) ("[A] preliminary construction made without full development of the record or issues should be open to revision."). ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████  *See, e.g.,*

*Blackboard Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed. Cir. 2009); *MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008). Although Invidi's cited description of CMMS 11 ***relates*** to the selection means, it does not ***describe*** a selection algorithm as required by 35 U.S.C. § 112 ¶ 6 and recent Federal Circuit decisions. The only component of the patent that does describe the algorithm in any detail is Figure 4.

### J.      "Identifying means"

| Term | Plaintiff's Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| "identifying means" | CMMS 11 | indefinite |

### 1.      Plaintiff's Opening Position

The "identifying means" is "for identifying the selected at least one commercial message with the network address of said at least one subscriber terminal."  As we discuss with regard to the "identifying" term, Invidi interprets the "identifying means" as structure that "associates" the selected commercial messages with one or more network addresses.  That structure is, again, CMMS 11.  The CMMS 11 implements a two-step identification / association.  A commercial is associated with a category and then the category is associated with network addresses: "When a break occurs in program material, commercial message schedule 31 determines which message will be sent to each household."  (3:55-56)  "The selection of households to receive commercial messages may be on the basis of household statistics in combination with the requirements stored in commercial routing database 33 . . . ."  (3:50-53)  The patent further references a smart commercial with category information and states that "this embedded information is utilized by a Commercial Massage Management Server (CMMS) 11 to produce a set of subscriber addresses corresponding to each category of recipient identified by the embedded information."  (3:24-26) Accordingly, the CMMS associates each commercial with subscriber addresses.

### 2.      Defendants' Answering Position

As discussed above, "[t]o avoid purely functional claiming in cases involving computer-implemented inventions," the Federal Circuit consistently requires "'that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor.'"  *Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) (quoting *Aristocrat Techs. Austl.*

*Pty Ltd. V. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). If special programming is required, the patent must disclose an algorithm in understandable terms including but not limited to diagrams, prose, or flow charts. *Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012). Here, the only possible structure for the "identifying means" is a general purpose computer, but no algorithm is disclosed. Accordingly, the term is indefinite.

Invidi argues that the "CMMS 11" is the corresponding structure. First, Invidi argues that the "CMMS 11 implements a two-step identification / association" process. *Supra* p. 75. And although Invidi omits the "[a]s is explained more fully below," Invidi points to a section of the specification where it states "[a]s is explained more fully below, this embedded information is utilized by a Commercial Message Management Server (CMMS) 11 to produce a set of subscriber addresses corresponding to each category of recipient identified by the embedded information." *Supra* p. 75. Below, the specification describes that the CMMS 11 will select certain households or groups of households to receive commercial messages. In other words, Invidi is pointing to the same disclosure for "identifying means" as it is for "selection means." Invidi fails to explain how these two differ, which would make "identifying means" meaningless and superfluous. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so"). This does not make sense.

To the extent the specification does describe the identification process, nothing in the specification or prosecution clearly links the CMMS 11 or any other structure to that function. The duty of a patentee to "clearly link" the structure with the claimed function is the "quid pro quo" of allowing means-plus-function claiming. *Med. Instrumentation Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *Kahn v. General Motors Corp.*, 135 F.3d 1472

76

(Fed. Cir. 1998). The specification must disclose a structure that one of skill in the art would understand to encompass the given function. *Elekta*, 344 F.3d at 1212. Thus, even if the CMMS 11 were capable of performing the recited function, nothing in the patent shows a clear link between the CMMS 11 and the function. *See Medtronic Inc. v. Advanced Card. Sys. Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001) ("The lack of a clear link or associations between the structures…and the function…nullifies the significance of [ ] arguments that a structure may perform two functions and that a function may be performed by two structures.").

Finally, even assuming the CMMS 11 is an "identifying means," the CMMS 11 is still a general purpose computer that requires special programming, and the specification does not disclose the required algorithm.

Accordingly, the term "identifying means" is indefinite.

### 3.    Plaintiff's Reply Position

Invidi explained in its Opening Brief that the CMMS 11 performs the identification via a two-step association. Recall that the "selection means" selected a commercial messages based on profile data and the result (in one embodiment) is a "smart commercial" ready for broadcast that associates the commercial with its category information. At this time, network addresses are unknown, and hence the need for an "identifying" function. The "identifying" function of the CMMS 11 then generates the set of subscriber addresses that correspond to the categories based on the information in the "smart commercials." (3:55-56). Thus, the identifying in the patent can be illustrated as follows:



| Commercial message | ⟺ | Category | ⟺ | Network Address |

██████████████████████████████████████████

█████████████ (JA-50). ███████████████████████████████

████████████████████████████████████████ Although these

components are involved in the process, the actual identifying is disclosed as being performed by

CMMS 11 which produces the set of subscriber addresses.

**4.    Defendants' Sur-Reply Position**

The "identifying means" term is indefinite.  The disclosure Invidi identifies for the

"identification means" describes the same process as it identified for the "selection means."

Invidi provides no explanation for how "network addresses are unknown" given that both the

"selection means" and the "identifying means" are "operatively associated" with the same

"reservoir of data."  Nor does Invidi's "two-step association" process make sense given that the

"selection means" selects "at least one of the commercial messages for transmission to at least

one of the subscriber terminals based on the subscriber profile data associated with said at least

one subscriber terminal."

MORRIS, NICHOLS, ARSHT &
  TUNNELL LLP

*Regina S.E. Murphy*
Jack B. Blumenfeld (#1014)
Regina S.E. Murphy (#5648)
1201 N. Market Street
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rmurphy@mnat.com

Of Counsel:

John E. Nathan
Catherine Nyarady
Andrew S. Brown
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
1285 Avenue Of The Americas
New York, NY 10019

FISH & RICHARDSON P.C.

*/s/ Thomas L. Halkowski*
Thomas L. Halkowski (#4099)
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
halkowski@fr.com

Of Counsel:

Frank E. Scherkenbach
Steven R. Katz
Fish & Richardson P.C.
One Marina Park Drive
Boston, Ma 02210

*Attorneys For Plaintiff*
*Invidi Technologies Corporation*

*Attorneys For Defendants Visible World, Inc.*
*and CSC Holdings, LLC*

Benjamin Hershkowitz
R. Scott Roe
Justin Solomon Nematzadeh
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

*Attorneys For CSC Holdings, LLC*


Dated:  January 11, 2013