## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INVIDI TECHNOLOGIES          )
CORPORATION,                 )
                             )
              Plaintiff,     )
                             )
      v.                     )          Civil Action No. 11-397-RGA-CJB
                             )
VISIBLE WORLD, INC. and      )
CSC HOLDINGS, LLC,           )
                             )
              Defendants.    )

### MEMORANDUM ORDER

Pending before the Court in this patent infringement action is Defendants Visible World,

Inc. ("Visible World") and CSC Holdings, LLC's ("CSC Holdings") (collectively, "Defendants")

motion to compel the production of documents withheld by Plaintiff Invidi Technologies

Corporation ("Invidi" or "Plaintiff") on the basis of the common interest doctrine. (D.I. 67)  For

the reasons discussed below, the Court finds that the common interest doctrine may apply to the

documents-at-issue, and orders Invidi to submit additional information to enable the Court to

make a final determination as to Defendants' motion.

## I.    BACKGROUND

### A.    Procedural Posture

On May 5, 2011, Invidi commenced this action, asserting that Defendant Visible World

and then-Defendant Cablevision Systems Corporation ("Cablevision") infringed one or more

claims of its U.S. Patent No. 5,661,516 (the "'516 Patent") entitled "System and Method for

Selectively Distributing Commercial Messages Over a Communications Network." (D.I. 1 & ex.

A)  On January 17, 2012, this action was referred to me by Judge Sue L. Robinson to hear and

resolve all discovery matters. On September 14, 2012, Judge Richard G. Andrews, now the District Judge presiding over the case, granted the parties' Joint Motion to Amend the Complaint to Substitute CSC Holdings in place of Cablevision as a defendant to this action. (D.I. 103) Accordingly, on September 14, 2012, Invidi filed a First Amended Complaint against Visible World and CSC Holdings. (D.I. 104)

In the First Amended Complaint, Invidi alleged that Visible World infringes the '516 Patent "by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, and/or partnering with Cablevision to operate, household addressable advertising systems including, for example, Visible World Connect and Conductor, installed in communications networks, including, for example, the Cablevision communications network." (D.I. 104 at ¶ 38)[1] Invidi similarly alleged that CSC Holdings infringes the '516 Patent "by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, and/or partnering with [Visible World] to operate, household addressable advertising systems including, for example, Visible World Connect and Conductor, installed in the Cablevision communications network." (D.I. 104 at ¶ 41) In addition, Invidi alleged joint infringement against Visible World and CSC Holdings, asserting that they together jointly infringe the '516 Patent in connection with their above-referenced involvement with household addressable advertising systems, including Visible World Connect and Conductor. (D.I. 104 at ¶ 44) On September 27, 2012, Visible World and CSC Holdings filed their Answers and Counterclaims. (D.I. 110, 111)

---

[1]     The First Amended Complaint refers to Defendant CSC Holdings as "Cablevision." (D.I. 104 at 1)

## B.    The Parties and the Assignment of the '516 Patent

Plaintiff Invidi provides "addressable television advertising and marketing solutions" technology to cable, satellite and telco video providers, enabling the providers to broadcast television advertisements to specific target audiences. (D.I. 104 at ¶ 1)  Defendant Visible World, *inter alia*, provides addressable advertising solutions to cable operators. (*Id.* at ¶ 2) Defendant CSC Holdings is a wholly-owned subsidiary of Cablevision, which provides cable, internet, and voice services to households and businesses. (D.I. 111 at ¶¶ 3, 31)

The '516 Patent, issued on August 26, 1997, covers "a system and method for distributing commercial messages to individually addressable subscriber terminals on a network." (D.I. 104 at ¶ 17; *id.* at ex. A)  John B. Carles is named as the inventor. (D.I. 104, ex. A)  In 2005, Mr. Carles accused Invidi's household addressable advertising system of infringing the '516 Patent. (D.I. 83 at 1)  Ultimately, Invidi convinced Mr. Carles that its system was not infringing, and the parties struck a deal for Invidi to purchase certain intellectual property, including the '516 Patent. (*Id.*)

As part of that process, on October 20, 2006, Mr. Carles and Invidi entered into a Patent Assignment Agreement ("PAA") regarding the '516 Patent.[2] (D.I. 83, ex. 5)  By the PAA's terms, Mr. Carles agreed to "sell[], assign[], transfer[], and set[] over to [Invidi] the entire right, title, and interest of [Mr. Carles] in and to" the '516 Patent. (*Id.* at ¶ 2)

The PAA included information regarding the financial terms of the sale (and the impact of those terms on the assignment of the patent).  It set forth that Invidi would agree to pay a sum

---

[2]    The PAA also included a transfer of rights relating to other patents or patent applications not relevant to this dispute. (D.I. 83, ex. 5 at ¶ 1.5 & ex. A)

3

of money immediately to Mr. Carles upon both sides signing the agreement, and thereafter, that

Invidi would issue monthly payments (beginning on the last day of November 2006) that would

be due on the last day of each month, and that would continue for thirty-five months. (*Id.* at ¶ 3)

The PAA also required Invidi to pay Mr. Carles interest on a quarterly basis beginning on the last

day of January 2007, and to issue him a warrant to purchase a certain amount of shares of

Invidi's common stock. (*Id.*)[3] The PAA's terms further provided that Invidi would be in default

if any required payment was not made within ten business days of the due date. (*Id.*) If Invidi

failed to pay the amount due in default within ten business days of a second notice of default

provided to it by Mr. Carles, the PAA required Invidi to "reassign" the '516 Patent "to [Mr.

Carles] upon [Mr. Carles'] written request." (*Id.*)

      The PAA contained other important provisions. Invidi was prohibited from selling,

assigning or licensing the '516 Patent without Mr. Carles' consent, until Invidi had fully made

payment on its obligations pursuant to the PAA. (*Id.*) Mr. Carles also agreed to "at any time,

upon request, use reasonable efforts to execute and deliver any and all papers that may be

necessary or desirable to perfect the title to" the '516 Patent and "sign all papers, make all rightful

oaths, and do all acts requisite for the filing of . . . divisional, continuation, or continuation-in-

part applications(s), or such application(s) for reissue and procuring thereof, and for the filing of .

. . disclaimer(s) . . . ." (*Id.* at ¶ 4) Finally, among other things, the PAA required Mr. Carles to

"at any time, upon request, communicate to [Invidi], at [Mr. Carles'] expense, any facts relating

to [the '516 Patent] or the history thereof, as may be known to [Mr. Carles], and testify as to the

---

[3]      The PAA did not provide Mr. Carles with any entitlement to royalties or future
revenue generated by Invidi as to the patent.

same in any interference or other litigation or dispute, when requested to do so." (*Id.* at ¶ 5)

After execution of the PAA, Mr. Carles apparently communicated with Invidi a number of times regarding the patents that Mr. Carles had assigned to Invidi. (D.I. 92 at 3) One such communication was a November 1, 2006 e-mail from Mr. Carles to David Downey, Chief Executive of Invidi. (*See* D.I. 83 at 3; D.I. 92 at 1) ("2006 Carles-Downey e-mail") The e-mail attached a 1993 patentability opinion letter ("1993 opinion letter") to Mr. Carles regarding the '516 Patent from an attorney with Darby & Darby, a New York City intellectual property law firm that is no longer in existence. (*See* D.I. 83 at 3; D.I. 92 at 1)

Following Invidi's acquisition of the '516 Patent from Mr. Carles, Invidi and Mr. Carles had another quarrel; among other things, Mr. Carles accused Invidi of fraudulently inducing him to enter into the PAA.[4] (D.I. 83 at 2; D.I. 92 at 4) Invidi denied any wrongdoing. (D.I. 92 at 4) Ultimately, Mr. Carles and Invidi entered into a second agreement (the "2010 Agreement") whereby the parties "re-affirm[ed] the PAA." (D.I. 83 at 2; *id.* at ex. 6, ¶ 3.1)[5] Furthermore, the 2010 Agreement contained terms designed to "expand the cooperation required of Carles under the PAA", and also confirmed that "Invidi will not ask Carles to take, and Carles will not take, a position on any issue relating to the Patent Activities which Carles does not believe to be entirely true and accurate." (D.I. 83, ex. 6 at ¶¶ 3.2, 3.2.5) Pursuant to the 2010 Agreement, Mr. Carles acknowledged that "all non-public records . . . relating to the Carles Patents . . . constitute Invidi-

---

[4]      The dispute between Mr. Carles and Invidi generated "extensive correspondence." (D.I. 92 at 4) Invidi does not contend that documents relating to the Invidi-Carles dispute are subject to the common interest doctrine, and such documents are not at issue in this motion. (*Id.*)

[5]      The copy of the 2010 Agreement attached to Defendants' brief is a partial copy received from Mr. Carles in response to a subpoena. (*See* D.I. 83 at 2 n.2 & ex. 6) Invidi has apparently not produced a complete copy of the 2010 Agreement to Defendants. (*Id.* at 2 n.2)

owned property" and agreed that he would take certain steps to enable Invidi to obtain such records.  (*Id.* at ¶ 3.2.3(A) & (B))

### C.    Documents-at-Issue and Defendants' Motion to Compel

On March 29, 2012, in the course of discovery, Invidi produced to Defendants the 2006 Carles-Downey e-mail and the attached 1993 opinion letter. (D.I. 83 at 3; D.I. 92 at 1)  On April 17, 2012, Defendants sought additional documents from Mr. Carles' files, on the basis that such documents are (1) responsive to certain of their document requests; (2) in Invidi's possession, custody, or control within the meaning of Federal Rule of Civil Procedure 34; and (3) not protected by any privilege. (D.I. 83 at 3; *id.*, ex. 8 at 5)

On May 30, 2012, Invidi informed Defendants that it had inadvertently produced the 2006 Carles-Downey e-mail and 1993 opinion letter, as both were subject to a claim of privilege, and that it was therefore exercising its claw back rights in accordance with Paragraph 15 of the Stipulated Protective Order ("Protective Order") in this case. (D.I. 83, ex. 9)  Specifically, Invidi argued that the 1993 opinion letter was protected by the attorney-client privilege and that the 2006 Carles-Downey e-mail was a communication protected by the common interest doctrine, because Invidi and Mr. Carles shared a "community of interest on matters regarding" the '516 Patent and the e-mail was a communication in furtherance of that common legal interest. (*Id.*)

On June 7, 2012, Defendants confirmed that they had sequestered or destroyed the 2006 Carles-Downey e-mail and the 1993 opinion letter in accordance with the Protective Order and Fed. R. Civ. P. 26(b)(5)(B), while at the same time disputing that the communications were protected by the common interest doctrine. (D.I. 83, ex. 10)  On July 11, 2012, after the parties failed to reach agreement on the common interest doctrine issue, they filed a joint Motion for a

Teleconference to Resolve a Discovery Dispute, (D.I. 67), as well as letter briefs outlining their

respective positions, (D.I. 68, 71). On July 19, 2012, the Court held a teleconference with the

parties, during which it ordered additional briefing on the common interest doctrine issue. (D.I.

71 at 1 n.1 (requesting opportunity for additional briefing on that issue)) Briefing on the issue

was completed by September 12, 2012. (D.I. 100)[6]

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 37 applies to motions to compel discovery, providing

that "[o]n notice to other parties and all affected persons, a party may move for an order

compelling . . . discovery." Fed. R. Civ. P. 37(a)(1). Under Federal Rule of Civil Procedure

26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to

any party's claim or defense . . . ." While it is well-settled that the Federal Rules permit broad

discovery, a party's right to discovery is not without limits. *Bayer AG v. Betachem, Inc.*, 173

F.3d 188, 191 (3d Cir. 1999) (citations omitted). One such limit is that courts may not order the

production of discovery that is protected by an evidentiary privilege. *See Stepanski v. Sun*

*Microsystems, Inc.*, No. 10-2700 (PGS), 2011 WL 8990579, at *18 (D.N.J. Dec. 9, 2011) (citing

---

[6]    Defendants have moved to compel Invidi to produce all documents and
communications with Mr. Carles that have been withheld on the basis of the common interest
doctrine. (D.I. 83 at 1) These documents include the 2006 Carles-Downey e-mail and attached
1993 opinion letter. Beyond those communications, however, the scope, identification, and
content of such documents is unclear. (D.I. 83 at 1 n.1 ("[I]t appears that Invidi has withheld at
least 147 documents on the basis of an alleged common legal interest with Mr. Carles."); D.I. 92
at 4–5 ("[T]he Defendants appear to be moving more broadly to compel production of additional
documents between Mr. Carles and Invidi . . . . However, the Defendants do not identify the
documents on which they are moving, but allege that Invidi withheld at least 147 documents . . . .
It is unclear to which entries the Defendants are referring. Regardless, to the extent that the
communications are between Mr. Carles and Indivi and concern collaborative work related to
supporting the patent-in-suit, such communications are protected under the community of interest
doctrine."))

*Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000)).

Generally, a party moving to compel discovery bears the burden of demonstrating the relevance of the requested information. *Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009); *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F. Supp. 232, 258 (D. Del. 1992). However, when documents otherwise relevant are sought to be protected from disclosure due to the asserted existence of an evidentiary privilege, the party seeking such protection bears the burden of establishing the privilege. *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 377 (D. Del. 2010); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:CV-09-1685, 2010 WL 4537002, at *1 (M.D. Pa. Nov. 3, 2010).

## III. DISCUSSION

Invidi does not appear to argue that the documents-at-issue are irrelevant. (D.I. 83 at 1 n.1; D.I. 92 at 5) Instead, Invidi argues that the documents-at-issue are protected from discovery by the common interest doctrine.[7] (D.I. 92 at 5; *accord id.* at 11)

### A. The Common Interest Doctrine as an Exception to the Attorney-Client Privilege Waiver Rule

#### 1. The Attorney-Client Privilege

The attorney-client privilege bestows upon the client the "right to refuse to disclose confidential communications between attorney and client made for the purpose of obtaining legal

---

[7]     The common interest doctrine is also referred to by courts as the "community of interest doctrine," "community of interest privilege" and the "common interest privilege." *See, e.g.*, *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 n.18 (3d Cir. 2007); *Hoffman-La Roche, Inc. v. Roxane Labs., Inc.*, No. 09-6335 (WJM), 2011 WL 1792791, at *5 (D.N.J. May 11, 2011).

advice." *Hoffman-La Roche, Inc. v. Roxane Labs., Inc.*, No. 09-6335 (WJM), 2011 WL

1792791, at *4 (D.N.J. May 11, 2011) (internal quotations marks and citation omitted). In

protecting these communications, the privilege "encourage[s] full and frank" information

exchanges within the attorney-client relationship, in order to promote the observation of law and

the administration of justice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981);

*Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991); *Union*

*Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1046 (D. Del. 1985). The privilege is

premised upon recognition by the courts that "the need to permit the attorney to provide sound

legal advice generally outweighs any disadvantage of withholding evidence in a particular case."

*Union Carbide*, 619 F. Supp. at 1046 (citation omitted); *accord Westinghouse*, 951 F.2d at 1423.

Because the privilege militates against the general rule promoting full disclosure of information

between parties to a lawsuit, however, courts must construe it narrowly. *Westinghouse*, 951 F.2d

at 1423; *Union Carbide*, 619 F. Supp. at 1046.[8]

The United States Court of Appeals for the Third Circuit has held that for the attorney-

---

[8]     This patent infringement action arises under federal law, with the Court's
jurisdiction based on 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a). (D.I. 104 at ¶ 4–5)
Accordingly, federal common law regarding the application of the attorney-client privilege
applies here. Fed. R. Evid. 501; *see also Pearson*, 211 F.3d at 66 (noting that "[i]n general,
federal privileges apply to federal law claims, and state privileges apply to claims arising under
state law"); *Avocent Redmond Corp. v. Rose Elecs., Inc.*, 516 F. Supp. 2d 1199, 1201 (W.D.
Wash. 2007) (noting that "[i]n actions based on federal law, such as a patent infringement suit,
the federal common law of attorney-client privilege applies"). In patent cases, regional circuit
law governs disputes such as this one, which relates to the attorney-client privilege and waiver of
that privilege, as those issues are not unique to patent law. *See, e.g., In re Google Inc.*, 462 F.
App'x 975, 977 (Fed. Cir. 2012); *In re Regents of the Univ. of California*, 101 F.3d 1386, 1390
(Fed. Cir. 1996) (analyzing application of common interest doctrine in patent case pursuant to the
law of the regional circuit); *MPT, Inc. v. Marathon Labels, Inc.*, No. 1:04 CV 2357, 2006 WL
314435, at *2 (N.D. Ohio Feb. 9, 2006) (same).

client privilege to protect a communication, "'it must be (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'" *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (additional citation and internal quotation marks omitted)). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Teleglobe*, 493 F.3d at 359. The party asserting the privilege bears the burden of establishing the requisite elements. *In re Grand Jury*, — F.3d —, 2012 WL 6156176, at *21 (3d Cir. 2012) (citations omitted). The privilege must be asserted on a document-by-document basis. *United States v. Rockwell Int'l.*, 897 F.2d 1255, 1265 (3d Cir. 1990) (stating that "claims of attorney-client privilege must be asserted document by document, rather than as a single, blanket assertion").

In line with the narrow construction that it receives, "[t]he privilege protects *only* those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse*, 951 F.2d at 1423–24 (internal quotation marks and citation omitted). Generally, a party's voluntary disclosure to a third party of information purportedly protected by the attorney-client privilege destroys the information's confidentiality, thus obviating the privilege. *Id.* at 1424 (citations omitted).

### 2.    The Common Interest Doctrine

The common interest doctrine is an exception to the general rule that voluntary disclosure to a third party of purportedly privileged information waives the privilege. *Leader Techs.*, 719 F. Supp. 2d at 376; *Union Carbide*, 619 F. Supp. at 1047. The doctrine has its roots in the joint-defense privilege, which was created by courts to "allow[] the attorneys of criminal co-

10

defendants to share confidential information about defense strategies without waiving the

privilege as against third parties." *Teleglobe*, 493 F.3d at 363–64. Eventually, courts expanded

the joint-defense privilege to "protect[] all communications shared within a proper 'community

of interest,' whether the context be criminal or civil." *Id.* at 364 (internal citations omitted).

Permitting disclosure of such communications to parties sharing a common legal interest is

"consistent with the goal underlying the [attorney-client] privilege because [this] type of

disclosure is sometimes necessary for the client to obtain informed legal advice." *Westinghouse*,

951 F.2d at 1424.

Further contours of the common interest doctrine will be discussed more fully below.

### B.   Invidi Could Not, and Did Not, Acquire Mr. Carles' Attorney-Client Privilege

At the outset, each party has recognized that with the transfer of the '516 Patent from Mr.

Carles to Invidi, Invidi could not and did not acquire the attorney-client privilege that Mr. Carles

may have once had in the 1993 opinion letter.[9]  (D.I. 71 at 1; D.I. 83 at 5)  Indeed, the mere

assignment of a patent from one party to another does not transfer the prior owner's attorney-

client privilege in documents to the new patent owner. *Trading Techs. Int'l, Inc. v. GL

Consultants, Inc.*, Nos. 05-4120, 05 C 5164, 2012 WL 874322, at *5–6 (N.D. Ill. Mar. 14, 2012);

*HTC Corp. v. IPCom GmbH & Co., KG*, No. 08-1897 (RMC), slip op. at 16 (D.D.C. Oct. 26,

2010) (D.I. 83, ex. 11), *mandamus denied*, 428 F. App'x 984 (Fed. Cir. 2011).

Therefore, Invidi is not arguing that it acquired Mr. Carles' attorney-client privilege in the

---

[9]      It does not appear to be disputed that the 1993 opinion letter itself, having been communicated to Mr. Carles by his attorney at Darby & Darby in confidence, is (absent waiver) protected by the attorney-client privilege. (*See* D.I. 83 at 4–5)

document, rendering it undiscoverable. Rather, Invidi is arguing that despite Mr. Carles'

disclosure of the 1993 opinion letter to it—a third party as to that privileged communication—the

document (and the email to which it was attached) are nevertheless protected by the common

interest doctrine. (D.I. 71 at 1-2; D.I. 92 at 5)

### C. Determining Whether the Common Interest Doctrine Applies to Protect the Documents-at-Issue

To prove that the common interest doctrine protects the documents-at-issue from

discovery, Invidi bears the burden of showing that an underlying privilege has been established,

and that (1) the communications-at-issue are made by separate parties in the course of a common

legal interest; (2) the communications are designed to further that common legal interest; and (3)

the privilege has not been waived. *MobileMedia Ideas LLC v. Apple Inc.*, No. 10-258-

SLR/MPT, 2012 WL 3971377, at *4 (D. Del. Sept. 10, 2012); *In re Leslie Controls, Inc.*, 437

B.R. 493, 496 (Bankr. D. Del. 2010); *see also Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D.

575, 578 (N.D. Cal. 2007).

### 1. Determining Whether a Common Legal Interest Existed Between Invidi and Mr. Carles

In order to determine whether a sufficient common legal interest existed between Invidi

and Mr. Carles, the Court must first examine the nature of such an interest, including the

question of what exactly does "legal interest" *mean*? In other words, what does a sufficiently

common legal interest between parties look like? Piecing together an answer is not a clear cut

task, as courts (including this Court) have noted that the legal boundaries that set out the scope of

the common interest doctrine are not well defined. *See, e..g., Leader Techs.*, 719 F. Supp. 2d at

376; *GTE Directories Serv., Corp. v. Pacific Bell Directory*, 135 F.R.D. 187, 191 (N.D. Cal.

1991).

The leading modern case describing the common interest doctrine, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146 (D.S.C. 1974), explained that the "key consideration is that the nature of the interest be *identical, not similar*, and be legal, not solely commercial." *Id.* at 1172 (emphasis added); *see, e.g., Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273 (N.D. Ill. 2004) (stating that the "shared interest must be identical, not simply similar"). A number of cases from this District have recited the *Duplan* standard, including the requirement that the shared legal interest be identical, in analyzing the common interest doctrine. *See, e.g., Leader Techs.*, 719 F. Supp. 2d at 376; *Corning Inc. v. SRU Biosys., LLC*, 223 F.R.D. 189, 190 (D. Del. 2004); *Constar Int'l, Inc. v. Cont'l Pet Techs., Inc.*, No Civ. A. 99-234-JJF, 2003 WL 22769044, at *1 (D. Del. Nov. 19, 2003); *Union Carbide*, 619 F. Supp. at 1047. In this case, both parties have cited to the "identical" interest requirement, and the Court will analyze this issue with this standard in mind. (D.I. 83 at 6; D.I. 92 at 5)[10]

---

[10]     It is worth noting that courts are not uniform in their characterization of just how similar the legal interests of the parties must be in order for the common interest doctrine to apply. In *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007), a case involving the application of Delaware privilege law, the Third Circuit analyzed the common interest doctrine in detail. In doing so, it noted the *Duplan* Court's explication of the need for the respective parties' interests to be identical, but also explained that the Restatement (Third) of the Law Governing Lawyers took a "more flexible approach than *Duplan*", emphasizing that the respective parties' interests "need not be entirely congruent." *Id.* at 365 (internal quotation marks omitted). The *Teleglobe* Court ultimately determined that it did not need to resolve that issue, and for purposes of the opinion, noted only that "members of the community of interest must share at least a substantially similar legal interest." *Id.* Some cases from this District have cited this "at least a substantially similar legal interest" language in articulating what must be established for the doctrine to apply. *See, e.g., MobileMedia*, 2012 WL 3971377, at *4; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142, 146 (D. Del. 2009); *see also e.g., CIF Licensing, LLC v. Agere Sys. LLC*, No. 07-170-LPS, 2012 WL 6085368, at *8 (D. Del. Dec. 3, 2012) (recognizing that some cases from this District cite to the strict *Duplan* standard while others utilize the language in *Teleglobe*). The Court will assume that the *Duplan* standard

The *legal*—not *solely commercial*—nature of the parties' interests is another key to the doctrine's applicability. Notably, the parties' interests do not have to be solely legal in nature. Rather, as this Court has noted, "the privilege may apply although the communications include discussions of various business matters as long as they are infused with legal concerns." *MobileMedia*, 2012 WL 3971377, at *4 (internal quotation marks and citation omitted). The parties do not have to be involved in "[a]ctual litigation" or an "ongoing lawsuit" for their interests to be legal; "anticipated litigation" is sufficient. *Id.*; *see also In re Leslie*, 437 B.R. at 496 (stating that doctrine applies even if litigation is not contemplated, so long as communication facilitates rendering of legal services to clients). Beyond these general principles, courts decide whether parties have a sufficient "common legal interest" on a case-by-case basis, based upon the facts of the given case.[11]

Here, Invidi notes that as part of the sale of the patent-at-issue, Mr. Carles "retained certain rights pending Invidi's completion of an installment payment plan for the patent" and also "agreed to provide Invidi, upon request, with any facts relating to the patents sold," such that the PAA created an "ongoing legal obligation for Mr. Carles, as the inventor, to assist Invidi in strengthening the purchased patents upon request from Invidi." (D.I. 92 at 7)  Therefore, Invidi

---

applies here and need not affirmatively decide the issue, as the Court's decision below is not affected by whether an "identical" legal interest or "at least substantially similar" legal interest is required for the application of the common interest doctrine.

[11]   *See, e.g.*, *Katz v. AT&T Corp.*, 191 F.R.D. 433, 438 n.4 (E.D. Pa. 2000) (noting that whether the requisite identity of interest to invoke the common interest doctrine is present "is a case specific determination to be made under the facts of the case"); *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *9 (Bankr. D. Del. Feb. 3, 2011) ("A determination involving whether a community of interest privilege applies is an intensely fact-and-circumstance-driven exercise.").

argues, "Invidi and Mr. Carles had a common legal interest in ensuring that the patents conveyed from Mr. Carles to Invidi were strong and enforceable." (*Id.*) Defendants argue to the contrary that Mr. Carles assigned his entire legal interest in the patent to Invidi pursuant to the PAA and thereafter maintained no such interest. (D.I. 83 at 7-12)

To obtain a better understanding of how the common interest doctrine applies to cases like these, the Court will first examine a few cases involving similar facts to those at play here. One such case is *In re Rivastigmine Patent Litig.*, No. 05 MD 1661 (HB/JCF), 2005 WL 2319005 (S.D.N.Y. Sept. 22, 2005), where the United States District Court for the Southern District of New York declined to find that a common legal interest existed among the plaintiffs (all entities related to Novartis Pharmaceutical Corporation, or "Novartis") and the inventors of a claimed method of treatment who worked at Hebrew University in Israel, or the licensing arm of the university (known as Yissum Development Corporation, or "Yissum"). *Id.* at *1. Novartis' complaint accused the defendants of infringing two patents relating to rivastigmine tartrate ("rivastigmine"), the active ingredient in the medication Exelon, by seeking approval from the United States Food and Drug Administration to market generic forms of Exelon. *Id.* At some point after conception of the invention, Yissum entered into discussions with an entity controlled by a predecessor of Novartis[12] concerning commercial exploitation of the invention. *Id.* In return, Novartis provided access to its network of patent attorneys to help prosecute the necessary patent applications. *Id.* Additionally, Yissum also retained an Israeli law firm to prosecute the original patent application in Israel. *Id.* at *2. At some point thereafter, Yissum and Novartis

---

[12]     For simplicity's sake, that entity and the predecessor company that controlled it will all be referred to as "Novartis."

signed an assignment agreement, in which Yissum assigned all rights in the invention to

Novartis, in return for Yissum's receipt of certain specific payments and ongoing royalties. *Id.* at

*1. Later, Yissum and Novartis entered into a second agreement that called for Yissum's

cooperation in future research. *Id.*

At issue were communications between representatives of Novartis and the Israeli law

firm about the patent, which had occurred both before and after the assignment of rights in the

invention to Novartis. *Id.* at *2. The defendants took the position that the communications that

occurred prior to the assignment were not protected by the common interest doctrine, because

prior to that assignment, Novartis and Yissum were adversaries in a negotiation process and did

not share a common legal interest. *Id.* Defendants also argued that communications occurring

after the assignment were not protected by the doctrine, because at that point, any common

interest between Novartis and Yissum were solely commercial, not legal. *Id.*

The *Rivastigmine* Court held that during the time prior to the assignment of all rights to

Novartis, Novartis and Yissum shared a "theoretical legal interest", in that they had been

"engaged in a joint program of developing technology and obtaining patents for it" such that they

"had a common legal interest in obtaining the patents in order to maximize the value of the

property that would ultimately be conveyed." *Id.* at *3. The Court deemed "more doubtful,"

however, whether the inventors and plaintiffs continued to have a common legal interest after the

assignment of the patent rights to plaintiffs, noting that at that point "the patent rights of Yissum

and the inventors were extinguished, even though they continued to have rights to royalties" and

that "[s]uch economic rights, standing alone, are generally not sufficient to support application of

the common interest doctrine." *Id.* at *4. The *Rivastigmine* Court ultimately concluded that the

16

plaintiffs had failed to meet their burden of proving the applicability of the doctrine to post-assignment communications because there was no indication that Yissum, the university, or the inventors had agreed to participate in a common legal strategy with Novartis after the assignment. *Id.* at \*4–5. The Court did note that such a common strategy might have been evidenced—had the agreement-at-issue stated that Yissum, the university or the inventors would "provide assistance to Novartis if requested" in the future. *Id.* at \*5 (internal quotation marks and citation omitted).[13]

Next, in an unpublished case relied on heavily by Defendants, the United States District Court for the District of Columbia declined to find a common legal interest between an original patent holder, Bosch, and the patent assignee, defendant IPCom. *HTC Corp.*, slip op. at 17 n.12 (D.I. 83, ex. 11). Bosch, a German firm, developed a group of telephony patents that it sold to IPCom. *Id.* at 1. During discovery, the plaintiff moved to compel the production of documents that were prepared by representatives for Bosch (either Bosch employees or Bosch's counsel) and then later sold to IPCom as part of the sale of the patent family. *Id.* at 1, 9, 16. IPCom objected to the production, *inter alia*, on the basis that the common interest doctrine protected the

---

[13]       *See also Prowess, Inc. v. Raysearch Labs. AB*, Civil Case No. WDQ-11-1357, 2013 WL 509021, at \*5 n.5, \*6 (D. Md. Feb. 11, 2013) (finding that common interest doctrine did not apply to communications among plaintiff-licensee of patents, assignee of patents and inventors of patents where, *inter alia*, the purported common interest agreement between plaintiff-licensee and assignee did not "mention any sort of mandated cooperation if [plaintiff] is involved in litigation relating to the Asserted Patents"); *Research Inst. for Med. and Chem., Inc. v. Wisconsin Alumni Research Found.*, 114 F.R.D. 672, 678 (W.D. Wis. 1987) (finding that common interest doctrine applied to communications between inventors and assignees of patents, after inventors had assigned patent rights, where, *inter alia*, as part of the assignment agreement the inventors agreed to cooperate in the prosecution of the patent applications and as to any litigation involving the issued patents, in return for a share of patent royalties) (cited in *Rivastigmine*, 2005 WL 2319005 at \*4).

documents from discovery. *Id.* at 17 n.12. The Court rejected IPCom's common interest argument and ordered the documents to be produced. *Id.* at 17-18. In doing so, the *HTC Corp.* Court noted that:

> Bosch sold the Patents and all documents relating to the Patents to IPCom; Bosch did not share this information as part of a joint legal claim or defense. Instead, Bosch shared information necessary for the sale of patent rights to IPCom—information that is critical to IPCom's ability to enforce the Patents and to HTC's challenge to the validity of the Patents.

*Id.* at 17 n.12.

Lastly, in *MobileMedia Ideas LLC v. Apple Inc.*, No. 10-258-SLR/MPT, 2012 WL 3971377 (D. Del. Sept. 10, 2012), an opinion issued after briefing on the instant motion closed, this Court addressed the common interest doctrine in a different, though somewhat related context. In that case, Sony, Nokia and another company known as MPEG came together in 2009 to discuss the formation of a company that would license and enforce certain of Sony and Nokia's patents, which were to be transferred to a new company for those purposes. *MobileMedia*, 2012 WL 3971377, at *1. Eventually, the new licensing and enforcement company, known as MMI, was formed; thereafter, pursuant to signed agreements, Sony and Nokia subsidiaries transferred intellectual property to MMI in exchange for an equity interest in MMI. *Id.* at *2. In order to enable MMI to enforce these rights, the Sony and Nokia subsidiaries also transferred certain patent prosecution files and information disclosure forms to MMI. *Id.* at *1–3. In *MobileMedia*, defendant Apple did not contest that MMI shared a common legal interest with Sony and Nokia after MMI's formation; instead, Apple challenged whether the communications relating to the transfer of the files and forms discussed above were in

18

furtherance of that common legal interest (and argued to the contrary that the communications were made "merely as part of the purported transfer of patents"). *Id.* at \*2–3.

The *MobileMedia* Court denied the defendant's motion to compel, holding that the documents in question were protected by the common interest doctrine. *Id.* at \*5–7. In doing so, it first noted that a number of factors suggested that the Sony, Nokia and MPEG entities ("the three entities") had been working to further a joint legal strategy with MMI, including that: (1) the Sony and Nokia entities were to receive distributions of future royalties and damages collected by MMI, such that they have a "direct interest in MMI's business"; (2) personnel from the three entities constituted MMI's Board, and MMI needed full Board approval to re-assign the patents-in-suit; and (3) the three entities had provided assistance and cooperation to MMI's outside attorneys, pursuant to a signed agreement, including details relating to the prosecution history of the patents-in-suit. *Id.* at \*5. The *MobileMedia* Court also noted that, at the time of the transmission of the communications-at-issue to MMI:

> [T]he Nokia and Sony entities had reversionary rights allowing ownership of the patents to revert back under certain conditions. Therefore, at the time of the transfer, the Nokia and Sony entities had a direct continued legal interest in the validity and enforceability of the patents.

*Id.* at \*6. These factors convinced the *MobileMedia* Court that the "Nokia and Sony entities anticipated litigation for enforcement of the transferred patents," that the "transfer of the patent prosecution files and [disclosure forms] were part of the joint legal strategy" involving the entities, and that the Sony and Nokia entities "clearly share a common legal interest in MMI prevailing in this action [and that the fact that] MMI is now the owner of the patents does not

eviscerate or prevent the sharing of a common legal interest with Nokia and Sony." *Id.* at *6.[14]

The above cases reveal that a court evaluating the sufficiency of a common legal interest between two parties in a situation similar to this one should closely examine the nature of any relevant agreement between the parties, including as to whether the agreement granted the assignor any continued rights in the patent—such as reversionary rights or a veto right in the event of possible transfer of the patent. The assignment agreement in *HTC Corp.*, for example, appears to have included no such retainment of rights for the transferor Bosch. This appears to have led to the *HTC Corp.* Court's conclusion that subsequent communications regarding the transfer of patent documents were solely related to the completion of a commercial transaction, and did not indicate that Bosch retained any ongoing common legal interest regarding the patents. In contrast, in *MobileMedia*, the fact that the Sony and Nokia entities had reversionary rights allowing ownership of the patents to revert back to them in certain circumstances emphasized to this Court that the Sony and Nokia entities had a "direct continued legal interest in the validity

---

[14]     There are a few other recent reported cases from this District evaluating the common interest doctrine in the context of patent litigation, though these cases share fewer facts in common with the present dispute than do the above cases. *Compare Xerox Corp. v. Google Inc.*, 801 F. Supp. 2d 293, 303 (D. Del. 2011) (finding a common legal interest between a patentee and its worldwide agent for IP licensing because the parties had an "allied, uniform, agency relationship" and such relationship "plainly relate[d] to litigation", as the licensing company was retained to assist the patentee with licensing strategy and patent enforcement, including litigation, and its compensation was contingent upon the patentee's success in litigation), *with Leader Techs.*, 719 F. Supp. 2d at 375–77 (overruling objections to Order finding no common legal interest regarding communications between a patentee and litigation financing companies, where a deal was never consummated between those entities), *and Corning Inc.*, 223 F.R.D. at 190 (rejecting the defendants' argument that the common interest doctrine protected documents exchanged by defendants and a potential investor in defendants, where such documents changed hands during negotiations and thus were provided "not in an effort to formulate a joint defense but rather to persuade the [potential investor] to invest in [defendants]").

and enforceability of the patents" that was of the same nature as MMI's interest in that regard.[15]

Here, Mr. Carles retained a reversionary ownership interest in the patents after the signing of the PAA. During the time period from the signing of the PAA through Invidi's completion of payment, had Invidi been in default of payment, the PAA required Invidi to reassign the '516 Patent to Mr. Carles at Mr. Carles' request. Perhaps relatedly, the PAA also prohibited Invidi from selling, assigning or licensing the '516 Patent without Mr. Carles' consent until Invidi completed payment—another provision emphasizing that Mr. Carles retained a legal interest in (and some measure of control over) the '516 Patent during that time.[16] Guided by the discussion in the cases above, the Court finds that until payment by Invidi was completed pursuant to the terms of the PAA, Mr. Carles had what can be described as an identical legal interest in the '516 Patent as did Invidi. During that time, any threat to the validity and enforceability of the '516 Patent that emerged would present the same kind of harm to the rights of both Invidi (as the owner) or Mr. Carles (as the potential future owner) in the patent. And here, it appears clear that the 2006 Carles-Downey e-mail and the attached 1993 opinion letter were sent to Invidi during

---

[15]     Although *MobileMedia* cited *Teleglobe* for the proposition that the members of the community of interest must share "at least a substantially similar legal interest," 2012 WL 3971377, at *4, the Court does not read the decision in *MobileMedia* to have turned on a finding that the common interest between the parties there was deemed "substantially similar" but would not have been deemed "identical."

[16]     Thus, although Defendants are correct that Paragraph 2 of the PAA states that Mr. Carles was transferring "the entire right" to the '516 Patent, the very next several paragraphs provide Mr. Carles with the above-referenced rights that also relate to the patent. (D.I. 83, ex. 5) Mr. Carles' reversionary right and veto right would be rendered toothless should the patent have been found to be invalid or unenforceable during the period that he retained these rights.

such a time, in anticipation of future litigation regarding the patent.[17]

The Defendants argue to the contrary that Mr. Carles' reversionary right to the '516 Patent and his ability to veto a transfer of the patent cannot give rise to a common legal interest because such interests are "exclusive"—in that "at the moment that Mr. Carles regained his interest in the '516 Patent, Invidi would give up its interest in that patent." (D.I. 100 at 10)  However, the Court does not believe that the conditional nature of Mr. Carles' future interest in the patent renders his legal interest any less meaningful in this context.  This conclusion gains support from the Federal Circuit's decision in *In re Regents of the Univ. of California*, 101 F.3d 1386 (Fed. Cir. 1996).  In that case, Genentech, Inc. ("Genentech") sought a declaration that the Regents of the University of California's ("UC") '877 patent was invalid, unenforceable, or not infringed by Genentech's hGH product line. *Id.* at 1388.  In 1978, several months after UC had filed the application that led to the patent-in-suit, UC entered into an exclusive option agreement with Eli Lilly and Company ("Lilly") for license rights to certain patents (including the application that led to the '877 patent), which stated that the license could become exclusive in the future upon certain conditions being met. *Id.* at 1388–89.  Thereafter, Lilly in-house attorneys assumed responsibility for prosecuting certain patent applications in conjunction with UC patent counsel. *Id.* at 1389.  Genentech sought to discover legal advice given in relation to the '877 Patent. *Id.*

---

[17]    The Court is not convinced that if the only post-assignment "interest" in the '516 Patent that Mr. Carles retained was the type of financial interest set out in the PAA (i.e., being owed future payments for the sale of the patent, or owed the transfer of warrants of Invidi stock due to the sale), this would constitute the type of common *legal* interest protected by the common interest doctrine.  The doctrine makes a distinction between "legal" interests and interests that are "solely commercial." *MobileMedia*, 2012 WL 3971377, at *4; *Corning Inc.*, 223 F.R.D. at 190. The Court believes that this type of interest (albeit one that can be protected by the legal process) is of the kind that would be deemed solely "commercial" in nature.

Applying regional circuit law, which required the existence of an identical legal interest among the parties, the Federal Circuit held that the common interest doctrine protected communications between UC and Lilly's attorneys subsequent to the inception of the option agreement—during which, for at least part of that period, Lilly was only an "optionee and a potential licensee." *Id.* at 1389-90. In doing so, the Federal Circuit noted that a "substantially identical" legal interest existed between Lilly and UC during this time because of "the potentially and ultimately exclusive nature of the Lilly-UC license agreement" and because both parties thus "shared the interest that UC would obtain valid and enforceable patents." *Id.* at 1390. Although the district court had determined that Lilly and UC did not have an identical interest in the '877 Patent because "'a patentee and nonexclusive licensee do not share identical legal interests,'" the Federal Circuit disagreed, noting that as of the time of the option agreement, Lilly had the potential to become an exclusive licensee (and ultimately did so), which made Lilly "more than a non-exclusive licensee." *Id.* At no point in its discussion did the Federal Circuit suggest that the conditional nature of Lilly's opportunity to become an exclusive licensee diminished the strength of its common legal interest with UC during that time. Therefore, the Court concludes that the above-referenced rights Mr. Carles retained in the '516 Patent were sufficient to provide him with a common legal interest to Invidi, so long as he retained those rights.

Additionally, unlike the case in *Rivastigmine*, here the PAA (and the 2010 Agreement) provided that Mr. Carles had a continuing duty to provide necessary documents, facts or testimony to support the patent after the PAA was signed. (D.I. 83 at ex. 5, ¶ 4-5) The Court agrees with Defendants that although these continuing obligations do amount to legal duties (in that if Mr. Carles did not follow through with them, Defendants could resort to the legal process

23

for recourse), even if those duties could be framed as a "legal interest" relating to the '516 Patent, the nature of such an interest would be very different (and far from identical) to the interest that Invidi retained in the validity and enforceability of the '516 Patent.  (D.I. 83 at 8-9; D.I. 100 at 2–3, 6); *see also HTC Corp.*, slip op. at 17 n.12.  However, in light of the Court's conclusion that Mr. Carles and Invidi *otherwise* shared a common legal interest in the '516 Patent, these ongoing obligations of Mr. Carles serve a different function.  They can be seen as the mechanism by which Mr. Carles would work with Invidi to pursue a common legal strategy going forward.

Therefore, Invidi has demonstrated that communications between Mr. Carles and Invidi from the date of the signing of the PAA through the completion of payment by Invidi pursuant to the PAA can be protected by the common interest doctrine, if the other elements regarding the test for applicability of the doctrine are satisfied.

### 2.    Documents-at-Issue

Upon finding a sufficient common legal interest between the parties, the Court must next evaluate the specific documents-at-issue.

### a.    Attorney-Sharing Requirement

At the outset, the Court must address another issue relating to the doctrine—whether it shields only communications between *attorneys* of the common interest members, or whether the doctrine extends to communications disclosed directly between non-attorney common interest members.  The distinction is important here because the 2006 Carles-Downey e-mail that has been produced for the Court's *in camera* review does not include attorneys; rather, the e-mail is a direct communication from Mr. Carles, the inventor, to Mr. Downey, the Chief Executive of Invidi.

In *Teleglobe*, the Third Circuit noted that its discussion of the common interest doctrine did not directly relate to the decision on the legal issue before it; however, it provided a detailed overview of the doctrine, because the district court decision-at-issue had ruled that the parties were in a "community of interest." 493 F.3d at 363 n.18 (internal quotation marks omitted). In analyzing the doctrine, the *Teleglobe* Court suggested that, pursuant to Delaware law, "to be eligible for continued protection, the communication must be shared with the *attorney* of the member of the community of interest" and that "[s]haring the communication directly with a member of the community *may* destroy the privilege." *Id.* at 364 (citing *Ramada Inns, Inc. v. Dow Jones & Co.*, 523 A.2d 968, 972 (Del. Super. Ct. 1986)) (second emphasis added). The *Teleglobe* Court noted that two leading authorities that discussed the common interest doctrine[18] did not "emphasize this [attorney-sharing] requirement," but the Court further described this aspect of the doctrine:

> The requirement that the clients' separate attorneys share information (and not the clients themselves) derives from the community-of-interest privilege's roots in the old joint-defense privilege, which . . . was developed to allow *attorneys* to coordinate their clients' criminal defense strategies. *See Chahoon v. Commw.*, 62 Va. 822, 21 Gratt. 822, 1871 WL 4931, at *11 (1871). Because the common-interest privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as a *post hoc* justification for a client's impermissible disclosures. The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies.

*Id.* at 364-65.

Citing to *Teleglobe*, patent infringement cases based on federal question jurisdiction from

---

[18]      The *Teleglobe* Court cited here to the Restatement (Third) of the Law Governing Lawyers § 76 and to Paul R. Rice, *Attorney-Client Privilege in the United States* (2d ed. 1999).

this District have referenced this language regarding an attorney-sharing requirement in their recitations of the elements of the common interest doctrine (albeit in cases that did not turn on the application of such a requirement).[19]   Cases from the United States District Court for the Eastern District of Pennsylvania have done the same, while not squarely addressing the issue, due to a finding that the common interest doctrine was inapplicable on other grounds.[20]   And this language from *Teleglobe* has been invoked by the United States District Court for the District of New Jersey, such as in a case where a court rejected the applicability of the common interest doctrine, in part because "the privilege does not extend to communications between non-attorneys who simply have a joint interest" and is applicable only to "communications amongst attorneys." *Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 214-15 (D.N.J. 2009); *see also Hoffman-La Roche, Inc.*, 2011 WL 1792791, at *5 (finding that the "common-interest doctrine only applies to communications *between attorneys*" and that doctrine did not apply there, as only one attorney was alleged to be involved in the communications-at-issue).

Other courts applying federal common law, however, have not included an attorney-

---

[19]   *See, e.g., MobileMedia*, 2012 WL 3971377, at *4 & n.39 (stating that "to qualify for and to maintain the privilege, the communications must be shared between counsel, and not just between the clients") (citing *Teleglobe*, 493 F.3d at 365); *Robert Bosch LLC*, 263 F.R.D. at 146 & n.26, n.27 (same) (citing *Teleglobe*, 493 F.3d at 365).

[20]   *See, e.g., In re Processed Egg Prod. Antitrust Litig.*, 278 F.R.D. 112, 118, 125 n.23 (E.D. Pa. 2011) (noting that because "the letters [at issue] were authored by and primarily addressed to executives of each company" this "further calls into question the applicability of the common-interest privilege"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797, 2011 WL 2623306, at *2, *6 (E.D. Pa. July 5, 2011) (noting some of the e-mails in question included non-lawyers from the relevant companies but "not reach[ing] the question as to the applicability of the [common interest] privilege to communications with non-lawyers" having already determined that the common interest doctrine did not protect the e-mails on other grounds).

sharing requirement as necessary to invoke the protection of the common interest doctrine.

Instead, those courts have tended to focus on whether the communications-at-issue are related to

the provision of legal advice or to litigation as to the common legal interest.  Accordingly, those

courts apply the doctrine to communications between two non-lawyers with a common legal

interest "in three instances": when "'(1) one party is seeking confidential information from the

other on behalf of an attorney; (2) one party is relaying confidential information to the other on

behalf of an attorney; and (3) the parties are communicating work product that is related to the

litigation.'" *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 239 F.R.D. 572, 584 (D.S.D. 2006)

(quoting *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc.*, No. Civ. A. 97 C 5827, 1999 WL

617842, at *6 (N.D. Ill. Aug. 12, 1999)); *see also Zitzka v. Vill. of Westmont*, No. 07 C 0949,

2009 WL 1346256, at *2 (N.D. Ill. May 13, 2009) (same).[21]  Conversely, communications by

parties concerning their "'personal views and opinions,' unconnected from communications with

counsel, are not subject to protection under the common interest doctrine." *Zitzka*, 2009 WL

1346256, at *2 (quoting *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 460 F. Supp. 2d

915, 920 (S.D. Ind. 2006)).  In permitting communications protected by the common interest

doctrine to extend to some communications between non-lawyers, these courts tend to note that

(1) in the single-party context, "it is the nature of the communication, rather than who the

communication is addressed to, that determines whether or not it is privileged", such that even

---

[21]      Other courts applying federal common law have similarly not considered the
attorney-sharing requirement to be necessary for the invocation of the common interest doctrine.
*See, e.g., Gucci America, Inc. v. Gucci*, No. 07 Civ 6820 (RMB) (JCF), 2008 WL 5251989, at *1
(S.D.N.Y. Dec. 15, 2008) (rejecting argument that the common interest doctrine does not apply if
the communication-at-issue is between two non-lawyers and finding that "[i]f information that is
otherwise privileged is shared between parties that have a common legal interest, the privilege is
not forfeited even though no attorney either creates or receives that communication").

communications between non-lawyers may still be privileged if one of the parties is seeking or relaying information on behalf of counsel; and (2) it would be "burdensome to require that the 'decision-makers' within the common interest cannot communicate with each other regarding legal advice they received from their attorneys, but must [instead] funnel those communications through the attorneys." *IBJ Whitehall Bank*, 1999 WL 617842, at \*6, \*7 & n.4.

One such court was the United States Bankruptcy Court for the District of Delaware, which addressed the issue in *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at \*6 (Bankr. D. Del. Feb. 3, 2011). There, the Bankruptcy Court noted that the *Teleglobe* Court's comments about the attorney-sharing requirement were "dicta" as to that case. *Id.* Ultimately, the *Tribune* Court concluded that "limit[ing] common interest communications to attorney-prepared communications is too restrictive" and that the appropriate inquiry is "whether the subject matter of the communication at issue would be protected by the attorney-client or work product privilege but for its disclosure to a party with the common interest." *Id.*; *cf. CIF Licensing, LLC v. Agere Sys. LLC*, C.A. No. 07-170-LPS, 2012 WL 6085368, at \*8 (D. Del. Dec. 3, 2012) (finding, during review of a motion alleging discovery misconduct, that as to communications between "current and former employees" of plaintiff and third party who were alleged to share a common legal interest, plaintiff had a good faith basis to believe that common interest privilege could have applied to communications).[22]

---

[22]    It is also worth noting that after *Teleglobe*, a Delaware Superior Court opinion concluded that the attorney-sharing requirement was not a necessary component of the common interest doctrine as set out in Delaware law. *See Rembrandt Techs., L.P. v. Harris Corp.*, No. 07C-09-059-JRS, 2009 WL 402332, at \*8 & n.78 (Del. Super. Ct. Feb. 12, 2009) ("The Court finds that separately represented clients sharing a common legal interest may, at least in certain situations and under the close supervision of counsel, communicate directly with one another regarding that shared interest.") (citing *IBJ Whitehall Bank*).

The Court acknowledges that there are understandable arguments on both sides as to whether a communication between two non-attorney representatives of parties sharing a common legal interest should ever be protected under the common interest doctrine. For the following reasons, the Court adopts the view here that in certain circumstances, the common interest doctrine can protect such communications.

First, after careful review of the *Teleglobe* decision, the Court concludes that *Teleglobe* is not binding authority on this point. Notably, as the *Tribune* Court stated, the *Teleglobe* Court's discussion of the common interest doctrine was not a part of its direct holding in the case, and came in the context of a case where Delaware state privilege law applied. While some other courts have interpreted *Teleglobe* as having a broader application beyond Delaware law,[23] other courts such as the *Tribune* Court have not, and this Court has not had occasion to squarely address this issue.

Second, while *Teleglobe* noted that the doctrine is meant to be a narrow exception to the disclosure rule, as the *IBJ Whitehall Bank* Court pointed out:

> [E]xtravagant privilege claims will be held in check by the practical fact that privilege assertions for communications that do not involve counsel as an author or recipient are more likely to be challenged and thus more likely to be subjected to an *in camera* review, in which the proponent of the privilege will have the burden of establishing its existence.

---

[23]     *See, e.g., Hoffman-La Roche, Inc.*, 2011 WL 1792791, at *6 n.6 (rejecting the argument that *Teleglobe*'s discussion of this aspect of the doctrine was commenting only on the state of Delaware law, noting that this "short-changes *Teleglobe* by emphasizing [that] . . . it has limited import beyond its facts" as there the "Third Circuit engaged in a contemplative analysis of the purpose, history, and requirements of the common-interest doctrine, without much reference to Delaware law at all"); *see also CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, Civil Action No. 11-4753, 2013 WL 315716, at *1 (E.D. Pa. Jan. 28, 2013) ("Indeed, '[w]hile *Teleglobe* was a case applying Delaware law, its discussion of the common-interest doctrine was not so limited.'") (quoting *Hoffman-La Roche*, 2011 WL 1792791, at *6 n.6).

1999 WL 617842, at *7 n.4. The applicability of the doctrine is also cabined by the many other

requirements for its use set out in the cases cited in this Order.

Third, the Court agrees with the *IBJ Whitehall Bank* Court (and other courts) that the

doctrine's purpose could still be served in some cases where two non-attorney representatives for

the parties are communicating privileged information in furtherance of the common interest. Our

Court has explained that in order to give "sufficient force" to a common interest claim of

privilege, courts should consider whether there has been a demonstration that the "disclosures

would not have been made but for the sake of securing, advancing or supplying legal

representation." *Leader Techs.*, 719 F. Supp. 2d at 376 (internal quotation marks and citations

omitted). Communications between common interest members on behalf of an attorney could

well be made for the sake of "advancing legal representation," even if that attorney was not

directly participating in the communication.

Finally, the Court notes that although there is no attorney listed on the 2006 Carles-

Downey email, Defendants never argued that the common interest doctrine did not apply to the

document for this reason. In fact, Defendants' only mention of an attorney-sharing requirement

as part of the doctrine was a citation to *Teleglobe* and a corresponding parenthetical indicating

that the case stands for the proposition that "recognizing potential for abuse, *Delaware law*

requires that communications be between counsel for common interest doctrine to apply." (D.I.

100 at 3) (emphasis added) As stated above, Delaware law does not apply to this dispute; rather,

federal common law applies.

Next, the Court must clarify the circumstances in which the common interest doctrine

may protect communications between non-attorneys. In this regard, the Court will be guided by

30

the framework established by the *IBJ Whitehall Bank* Court, which has been utilized by other

courts. Specifically, the Court finds that a party must establish, in order to invoke the common

interest doctrine as to a communication between two non-attorneys, that the communication

reflects one of three circumstances: "(1) one party is seeking confidential information from the

other on behalf of an attorney; (2) one party is relaying confidential information to the other on

behalf of an attorney; and (3) the parties are communicating work product that is related to []

litigation." *IBJ Whitehall Bank*, 1999 WL 617842, at *6. As to the third circumstance, the work

product doctrine protects papers "prepared by or on behalf of attorneys in anticipation of

litigation." *Westinghouse*, 951 F.2d at 1428; *accord WebXchange Inc. v. Dell Inc.*, 264 F.R.D.

123, 128 (D. Del. 2010) (citation omitted); Fed. R. Civ. P. 26(b)(3) (defining work product as

"documents and tangible things that are prepared in anticipation of litigation or for trial by or for

another party or its representative (including the other party's attorney, consultant, surety,

indemnitor, insurer, or agent)").

Here, the 2006 Carles-Downey e-mail does not specifically indicate that the information

disclosed therein was sought by an attorney or was relayed at the direction of an attorney. In

other words, the document does not explicitly convey that Mr. Carles was sending the e-mail and

enclosing the 1993 opinion letter in response to a request from counsel for Invidi, or at the behest

of an attorney for Mr. Carles. However, Invidi's briefing argued that the second qualifying

circumstance referenced above applies here—that the 2006 Carles-Downey e-mail is a

communication "reflect[ing] a request for legal advice" that was "generated at the request of

Invidi counsel." (D.I. 71, ex. A)[24] However, Invidi has not included with its briefing any

affidavit(s) or other similar evidence confirming the same and the Court thus does not have

sufficient evidence before it as to this point. *See Willemijn Houdstermaatschaapij BV v. Apollo*

*Computer Inc.*, 707 F. Supp. 1429, 1443 (D. Del. 1989) (noting that party asserting that elements

of a privilege apply "usually" makes such a showing "by affidavit").[25]

Invidi's failure to provide an affidavit as to this issue is somewhat understandable, as

Defendants confined their challenge to the applicability of the common interest doctrine to an

assertion that the parties did not share a sufficiently common legal interest. Accordingly, the

Court will provide Invidi the opportunity to submit an affidavit or declaration, if such a showing

can be made, indicating that the 2006 Carles-Downey email was generated because one party was

relaying confidential information to the other on behalf of an attorney.

    **b.**    **Remaining Elements Regarding Applicability of the Common Interest Doctrine**

In order for the common interest doctrine to protect documents from discovery, the Court

must determine that those documents further the common legal interest between the parties. *See,*

*e.g.*, *MobileMedia*, 2012 WL 3971377, at *2 (evaluating the documents-at-issue to determine

---

[24]    Invidi did not assert in its briefing that the 1993 opinion letter is itself work product.

[25]    *See also Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*, Civil Action No. 09-CV-0663, 2011 WL 1636949, at *5 (D. Del. Apr. 29, 2011) (relying on affidavit to conclude that document-at-issue was "protected, at the very least by the work-product doctrine"); *Bernstein v. Principal Life Ins. Co.*, No. 09 Civ. 4925(CM)(HBP), 2010 WL 4922093, at *3 (S.D.N.Y. Dec. 2, 2010) (requiring person involved in communications allegedly protected by the attorney-client privilege to "submit an affidavit or declaration describing the general nature of his communications with [counsel] and explaining how the elements of the attorney-client privilege are established" in order to rule on the issue).

whether they were shared in furtherance of a joint legal strategy). The Court does not have any difficulty concluding that the 2006 Carles-Downey email, enclosing the 1993 patentability opinion, furthers the parties' common legal interest in maintaining a strong and valid patent.

Finally, the Court must find that the privilege and protection afforded by the common interest doctrine has not been waived. *Id.* at *4; *In re Imperial Corp. of Am.*, 179 F.R.D. 286, 289 (S.D. Cal. 1998). There is no indication here that Mr. Carles or Invidi have waived that privilege.

## IV.   CONCLUSION

For the reasons outlined above, the Court cannot conclude at this time whether the common interest doctrine protects the 2006 Downey-Carles e-mail and the 1993 patentability opinion from disclosure to Defendants. Accordingly, the Court orders Invidi to submit, by no later than **March 20, 2013**, either (1) an affidavit or declaration indicating that the 2006 Carles-Downey email was generated because one party was relaying confidential information to the other on behalf of an attorney; or (2) a letter indicating that the underlying facts here do not support such a statement.

As to any other documents being withheld by Invidi on the basis of the common interest doctrine, the parties are directed to meet and confer regarding a time line for Invidi to update its privilege log and to produce any documents that could not be protected by the doctrine (and are not withheld on another basis), as it is set out in this Memorandum Order. If additional disputes arise regarding the applicability of the common interest doctrine or the production of currently withheld documents, and the parties cannot resolve those disputes, they should resort to the Court's discovery dispute procedures. (D.I. 153)

Because this Memorandum Order may contain confidential information, it has been

released under seal, pending review by the parties to allow them to submit a single, jointly

proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version

shall be submitted no later than **March 20, 2013** for review by the Court.  The Court will

subsequently issue a publicly-available version of its Memorandum Order.


Dated:  March 11, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

34